J-A12001-17

2017 PA Super 413

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JORDAN TIMOTHY ADAMS | |
| Appellant | No. 813 WDA 2016 |

Appeal from the Order Dated May 5, 2016
In the Court of Common Pleas of Warren County
Criminal Division at No(s): CP-62-CR-0000173-2015

BEFORE: OLSON, J., SOLANO, J., and RANSOM, J.

OPINION BY SOLANO, J.:                    FILED DECEMBER 27, 2017

Appellant Jordan Timothy Adams appeals from the order entered May 5, 2016, denying his motion to dismiss the charges against him on double jeopardy grounds. Also before this Court is Appellant's Motion to Strike Appendix A of the Commonwealth's Brief. We affirm the order of the trial court and deny Appellant's Motion to Strike.

On April 15, 2015, Appellant was charged with multiple crimes arising from the passing of counterfeit fifty-dollar bills at the Warren County Fair in August 2014.[1] Appellant's co-defendant, Christine Redding, was charged with similar crimes, including a charge of conspiring with Appellant to commit forgery. Redding later pleaded guilty to the criminal conspiracy

_____

[1] By the time of Appellant's trial, he faced 21 counts of forgery, 18 Pa.C.S. § 4101(a)(3), 14 counts of theft by deception, 18 Pa.C.S. § 3922(a)(1), 14 counts of retail theft, 18 Pa.C.S. § 3929(a)(1), and 3 counts of criminal conspiracy, 18 Pa.C.S. § 903(a)(1).

charge, with the agreement that she would testify against Appellant.[2] Redding was subpoenaed to appear at Appellant's trial.

Appellant filed a motion for discovery on November 17, 2015. The request included, among other things, "[a]ny evidence favorable to the accused which is material either to guilt or to punishment, and which is in the possession of the attorney for the Commonwealth," and "[a]ll written or recorded statements, and substantially verbatim oral statements, made by co-defendants and by co-conspirators or accomplices, whether such individuals have been charged or not." Mot., 11/17/15, at ¶ A, K. The motion specified that the request was in accordance with Pa.R.Crim.P. 573, which governs discovery in a criminal case.

Prior to trial, Appellant's counsel followed-up on the discovery motion by sending an e-mail to the prosecutor in the case, Warren County First Assistant District Attorney Caleb Gnage. The e-mail requested "any recorded statements by [Appellant] or any of the co[-]defendants." See Appellant's Ex. 3 to Hr'g on Appellant's Mot. to Dismiss. Gnage responded that he would have a copy of "the DVD" available for Appellant's counsel to pick up, and that he would "comb [the] file" for required discovery. Id. Gnage had previously sent an e-mail to the state police requesting "all the audio/video recordings admitted into evidence" on Appellant's case. Commonwealth's Ex. 1 to Hr'g on Appellant's Mot. to Dismiss.

_____

[2] The factual basis for Redding's plea does not appear in the record.

Appellant's jury trial began on June 12, 2016. The Commonwealth presented twelve witnesses who were vendors at the Warren County Fair and who had received counterfeit fifty-dollar bills on August 4, 2014.[3] None of the vendors were able to positively identify Appellant at trial, and none testified that they had been able to identify Appellant in a photographic lineup when interviewed by the police. However, three of the vendors gave descriptions of a man with characteristics similar to Appellant, and two of the vendors testified that they received a counterfeit bill from a man with a neck tattoo. Appellant has such a tattoo. One of those vendors testified that he received a first counterfeit bill from a young woman, and the second from a young man who had a neck tattoo and a hat displaying the emblem of a marijuana leaf.[4]

State Trooper Jeffrey Osborne, the lead investigator on the case, testified that he was contacted by security for the fair and interviewed several vendors at the fair the next day, August 5, 2014.[5] After contacting other officers who were investigating counterfeit cases, he interviewed

_____

[3] Some vendors testified that they personally received the counterfeit bills; others testified that they were responsible for a vending booth and discovered the notes during their accounting that night or the following morning, or that the notes had been discovered by co-workers.

[4] The Commonwealth also presented the testimony of a security worker at the fair, and introduced into evidence the counterfeit bills recovered by the police.

[5] Osborne also testified that in his subsequent interviews with the vendors, none were able to identify Appellant from a photographic lineup.

several suspects in those cases who had passed counterfeit bills with the same serial numbers as those recovered at the fair. The information garnered from those interviews led Osborne to suspect that Appellant and Redding had conspired to pass bills at the fair.

Osborne testified that he interviewed Appellant twice. The first interview took place on April 27, 2015. It was audio recorded, but the recording was deleted when Osborne attempted to transfer the digital file to storage that same day. According to Osborne,[6] Appellant initially denied any knowledge of or involvement with the crime, but ultimately confessed to passing four or five counterfeit bills at the fair, with someone named "Carla," and stated that he had purchased a hat with a marijuana leaf emblem. Appellant also said something to Osborne along the lines of "having a tattoo on his neck was not a good idea while committing a crime." N.T., 1/12/16, at 259.

During the second interview, on May 6, 2015, Appellant again confessed to Osborne, this time to passing three counterfeit bills at the fair. The second interview was also audio recorded, and portions of it were played at trial.

Osborne testified that he also interviewed Redding, but only once. When Appellant's attorney asked if that interview had been recorded, Gnage called a sidebar and informed the court that the interview of Redding would

---

[6] Osborne testified regarding his first interview with Appellant after refreshing his memory with the police report.

not have been recorded, as it was done during a polygraph examination. The prosecutor stated "she wouldn't have been video taped. And it's not the habit to video tape someone when they are under polygraph." N.T., 1/12/16, at 319. When questioning resumed, Osborne clarified that he interviewed Redding in jail, and that the interview was not recorded.[7] Osborne testified that Redding was later interviewed by Corporal Brian Zeybel at the police barracks (referring to the polygraph examination), but that Osborne was not present during that interview.

Corporal Zeybel, whose job mainly entails conducting polygraph examinations, testified that he accompanied Trooper Osborne to the fair and assisted with interviewing witnesses. He testified that he also interviewed Redding.[8] When asked on cross-examination whether there was a recording of the interview, Zeybel answered that there was. A sidebar conference was called, at which Appellant's counsel complained that she was not given a copy of the recording of the interview. Appellant's counsel requested the opportunity to review the recording of the interview that night. Appellant's counsel was given a copy of the video, and court was adjourned.

When Appellant's trial resumed the following day, Appellant moved for a mistrial. Appellant's counsel informed the court that the video in fact

_____

[7] The interview of Redding took place on May 6, 2015, and was memorialized in the police report. See Report at 35-36.

[8] Because the results of a polygraph examination are generally inadmissible in court proceedings, Zeybel did not testify before the jury that his interview of Redding was during a polygraph examination.

shows two interviews: (1) Zeybel's interview of Redding during the polygraph examination, and (2) Osborne interviewing Redding immediately afterwards. Gnage stated that he was unaware that Zeybel's interview had been recorded, as it was not indicated in the police report, and was unaware that Osborne had also interviewed Redding on that date, as this was also left out of the report.[9] Appellant argued that the statements made by Redding during the interviews were favorable to Appellant and would have altered the defense strategy at trial. In response, Gnage stated, "I agree that we have absolutely no argument and this is a Brady[10] violation. It's absolutely discoverable. It would change the nature of the defense." N.T., 1/13/16, at 6. The court granted the motion for a mistrial and dismissed the jury. Notably, Redding did not appear at the courthouse on either day of Appellant's trial.[11] The Commonwealth did not appeal the mistrial order.

On April 11, 2016, Appellant filed a motion to dismiss the charges. Appellant contended that prosecutorial misconduct warranted the dismissal

_____

[9] The fact of the interview was also left out of Osborne's direct testimony.

[10] "In Brady [v. Maryland, 373 U.S. 83 (1963)], the United States Supreme Court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" Commonwealth v. Sullivan, 820 A.2d 795, 802 n.5 (Pa. Super. 2003). Brady evidence includes exculpatory impeachment evidence. Commonwealth v. Lambert, 884 A.2d 848, 854 (Pa. 2005).

[11] Redding's whereabouts were still unknown at the time of the hearing on the motion to dismiss on May 5, 2016.

because Trooper Osborne and Corporal Zeybel knew of the two recorded interviews of Redding and failed to provide them to Appellant or include them in the police report, and Gnage misled the court by stating that no such video existed. Appellant argued that the Commonwealth should be precluded from retrying Appellant, as it would violate his double jeopardy rights under the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Constitution of Pennsylvania.

In its answer, which was filed by Gnage, the Commonwealth asserted that the videos of Redding's statements to Osborne and Zeybel were not subject to mandatory disclosure under Pa.R.Crim.P. 573(B)(1),[12] but instead were subject to discovery pursuant to a court order under Pa.R.Crim.P. 573(B)(2)(a)(iii),[13] and that their discovery had not been ordered by the

_____

[12] This portion of Rule 573 mandates disclosure, in accordance with Brady, of "Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth." Pa.R.Crim.P. 573(B)(1)(a). See Commonwealth v. Burke, 781 A.2d 1136, 1139 n.4, 1141 (Pa. 2001) (noting that Rule 573(B)(1)(a), formerly Rule 305(B)(1)(a), "was promulgated in response to the dictates of Brady").

[13] This portion of Rule 573 states:

> (a) In all court cases . . . if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing that they are material to the preparation of the defense, and that the request is reasonable:
>
> . . .

(Footnote Continued Next Page)

court. The Commonwealth also argued that no prosecutorial misconduct had occurred, as the Commonwealth was not aware of the existence of the undisclosed recordings of the interviews and did not intentionally withhold any discoverable evidence from Appellant. According to the Commonwealth, the police "simply neglected" to communicate the existence of the recordings to the prosecutor, and did not act with the intention of causing prejudice to Appellant. See Resp. 5/2/16, at ¶ 9.

The Commonwealth attached to its answer a copy of the full 44-page police report authored in alternating portions by Osborne and Zeybel (and some other officers), which was given to the defense prior to trial. In a portion authored by Osborne, the report states that on May 12, 2015, Redding took a polygraph test, and "[a]ccording to Zeybel, Redding failed the polygraph test. The supplemental report from Cpl. Zeybel will be attached to this report when received. Reference supplemental report from Cpl. Zeybel for additional details." Report at 36 (some capitalization omitted). The report does not mention Osborne's interview of Redding that day, or that either interview was recorded.

(Footnote Continued) ————————————
> (iii) all written and recorded statements, and substantially verbatim oral statements, made by co-defendants, and by co-conspirators or accomplices, whether such individuals have been charged or not;

Pa.R.Crim.P. 573(2)(a)(iii).

The supplemental polygraph report (authored by Zeybel, and incorporated at pages 37 through 39 of the police report) does not state that the examination was audio- or video-recorded. The supplemental report states that Redding told Zeybel that she had made plans to accompany Appellant to the fair in order to pass counterfeit bills, but "just prior to the scheduled trip[,] the car they were to use got a flat tire and Redding decided to back out of the planned scam," and "Redding . . . believes [Appellant] did in fact come to Warren Co. and pass some fake bills at the Fair as planned." Report at 39 (capitalization omitted). The report also conveys the following: "Redding wanted back out on the street mentioning ankle monitors, doing sex acts with [another counterfeit suspect] in attempt to gather information for [the police], wearing a wire, and or anything else to get her out of jail. Redding was desperate to say the least." Id. (capitalization omitted).[14]

A hearing was held on the motion to dismiss on May 5, 2016. Robert Greene, the District Attorney for Warren County, represented the Commonwealth. Trooper Osborne testified that he arranged for Zeybel's polygraph of Redding, but was not present in the room during the test itself. Osborne stated that he has no knowledge of the polygraph procedures, including when Zeybel records polygraph examinations, or when those recordings are entered into evidence in a case.

_____

[14] The report notes "This examiner believes this desperation being possibly related to the fresh bruises and needle marks on the interior of [Redding's] arm(s) as noted during the connection of the Polygraph equipment." Report at 39.

Osborne testified that he did not remember that he interviewed Redding after the polygraph exam until the video of the interview came to light at Appellant's trial. He had not known at the time of the interview that the interview was recorded, as it was recorded by Zeybel's polygraph equipment and not his own recording equipment, and he had not reported the interview in the police report. Normally, according to Osborne, if he was recording an interview, he would start by informing the subject that he or she was being recorded, and the video of his interview of Redding shows that was not done. Osborne testified that he never intentionally lied during Appellant's trial about not interviewing Redding after the polygraph examination, and that he never intentionally withheld the video. According to Osborne, Redding did not disclose any material information during the interview.

Osborne testified that the police report also indicates that both Osborne and Zeybel spoke to Redding again on May 15, 2015, the day after the polygraph exam. See Report at 39. He said he does not recollect that conversation. He did not mention that third interview during his direct testimony at trial.

Osborne also testified that he did not mention his first interview with Appellant (the recording of which had been deleted) in the report because it "wasn't important enough." N.T., 5/5/16, at 21. Osborne testified that Gnage had requested all evidence from the police in preparation for trial, but

Osborne could not recall whether Gnage had specifically asked for recorded or written statements made by co-defendants or other witnesses.

Corporal Zeybel testified that, while polygraph examiners are not required to record their examinations, he records 99.9% of his polygraph examinations, and that this was common knowledge in the Warren barracks. Zeybel would typically make a copy of the video recording, print the accompanying test results, and keep them both secured in a closet in his office. A supplemental report regarding the polygraph would be given to a supervising officer and attached to the police investigation report, which would eventually be given to the prosecutor on the case. Zeybel testified that he would enter a recorded statement into case evidence only if the statement had "evidentiary value" — that is, when it contained a confession. N.T., 5/5/16, at 86.

Appellant introduced a copy of the state police administrative regulations governing polygraph examinations, which state, "If the polygraph examination is A/V recorded, the original copy (CD/DVD) shall be provided to the investigating officer and shall be handled as evidence in accordance with AR 3-3, Storage and Security of Property. A copy shall be retained at the polygraph examiner's assigned station." Appellant's Ex. 1 to Hr'g on Appellant's Mot. to Dismiss, at 13.[15] Zeybel testified that he was

_____

[15] The provisions of "AR 3-3 Storage and Security" were not made part of the record; however, Zeybel agreed that this section of the manual "talks
(Footnote Continued Next Page)

"mistaken" for failing to comply with the regulation, but that he does not enter every recorded statement into evidence "only for the sheer fact [the investigating officers] have to eventually account for this, dispose of it. And, it becomes a thorn in their side." N.T., 5/5/16 at 86. Zeybel testified that since Appellant's mistrial, he has changed his practice; now, if he records a polygraph examination, he includes that information in his report. He still does not put the recording into case evidence unless it includes a confession, or unless it is specifically requested.[16]

Corporal Zeybel testified that because Redding did not confess during or after the polygraph, and the information provided by Redding during her polygraph exam "did not implicate" Appellant, a recording was not made part of the police investigation file. N.T., 5/5/16, at 87. Instead, Zeybel summarized in the supplemental report the statements made by Redding during the polygraph examination. Until Appellant's trial, Corporal Zybel did not realize that his interview with Redding was considered "part of" Appellant's case. Id. at 77.

Zeybel testified that he did not include in the supplemental polygraph report that Osborne had also interviewed Redding that day because it was

(Footnote Continued) ————————————
about when you get evidence you give it a number, put it in the evidence room . . . et cetera." N.T. 5/5/16, at 57-58.

[16] The regulations also state that an investigating officer shall be present during the polygraph examination. Zeybel testified that, in his view, this is only so that the investigating officer can help guide the questioning, and as long as the investigating officer is nearby, the regulations are satisfied.

not a part of the polygraph examination. Zeybel believes that Osborne was aware that the interview was being recorded, because he believes he gave "a preamble on camera with him present." N.T., 5/5/16, at 103. Ultimately, Zeybel testified that he did not intentionally withhold any material evidence.

First Assistant District Attorney Gnage testified that he recalled speaking with Osborne and Zeybel about the polygraph examination, but never asked them whether the polygraph exam was recorded; because a recording was not indicated in the police report, Gnage was not aware of the recording until Appellant's trial. Gnage testified that he believed that polygraph examinations were never recorded because his office has never received a recording of such an examination.[17] He did not specifically request a recording of the polygraph examination, but requested any and all discovery. Gnage stated that he had no reason not to trust law enforcement to give him all evidence he requested.

Gnage testified that his office sometimes has had difficulty obtaining discovery from law enforcement agencies in Warren County, and that this issue has been addressed repeatedly at meetings between the District Attorney's office and chief law enforcement officers. Gnage knows of only one discovery violation which led to a mistrial, and other cases in which

_____

[17] Gnage also testified that Appellant's attorney, who used to work in the DA's office with him, wrote in Appellant's motion to dismiss that polygraph examinations were "always recorded"; Gnage claims that, as she knew that a polygraph examination had been done in Appellant's case (due to the report), she should therefore have specifically requested the video of it during discovery. N.T., 5/5/16, at 173.

discovery was provided late. Gnage testified that none of the discovery violations were intentional.

A copy of the video was played at the hearing.[18] In the video, Zeybel is shown interviewing Redding for approximately two hours, during which he administers a polygraph examination, which Redding failed. As stated in the report, Redding told Zeybel that she was supposed to go with Appellant to the Warren County fair, but ended up not going. After Redding failed the exam, Zeybel pressed her for information about the origin of the bills, the destination of the stolen merchandise, and the involvement of other people, and stated that she could give this information to the police to "help herself out." Redding then protested that she had no further knowledge regarding the crime, but that she would be willing to do "anything" to get out of jail, including gathering information by wearing a wire and ankle monitor, and she flippantly offered to perform sex acts with another suspect to get him to talk. In addition, and not included in the report, Redding told Zeybel that she hates Appellant and blames him for her charges.

The video also showed that roughly ten minutes after the conclusion of the polygraph with Zeybel, and in the same room, Osborne interviewed Redding for approximately nine minutes. Prior to that interview, Zeybel stated for the camera that Trooper Osborne was next going to interview Redding; the recording shows Osborne standing in the hallway and looking

_____

[18] This Court also watched the video, which is part of the certified record.

into the room at the beginning of this statement. Zeybel then exited the room, and Osborne returned with Redding. During the interview with Osborne, Redding expressed her disappointment and confusion over failing the polygraph test, and regretted agreeing to take it.

At the conclusion of the hearing, District Attorney Greene conceded that the video of Redding's statements should have been provided to the defense, and that failure to do so was a Brady violation.[19] Greene also stated that he was not going to argue this point, in part because the trial court had already ruled that there had been a Brady violation.[20] Instead, Greene argued that there was no prosecutorial misconduct to warrant dismissal of the charges, as there had been no intentional withholding of evidence on either the part of the police or the prosecutor. Greene stated that "mistakes [were] made" when the police did not include in the report that Osborne had spoken with Redding after the polygraph exam and did not log the video of the interviews into evidence. N.T., 5/5/16, at 188.[21] He also argued that he was doing everything in his power to ensure that officers in Warren County adhere to the discovery rules.

_____

[19] Greene simultaneously maintained that the evidence was material but that its withholding did not prejudice Appellant.

[20] Greene presumably was referring to the court's grant of Appellant's motion for a mistrial.

[21] According to the District Attorney, "When [Gnage] asks law enforcement . . . for discovery, we expect to get everything. We shouldn't have to go through and redo the investigation to make sure we have got every single piece." N.T., 5/5/16, at 189.

Appellant argued that having to know what evidence exists before asking for it places an undue burden on defendants. According to Appellant, District Attorney Greene is the chief law enforcement officer in the county, and, along with First Assistant District Attorney Gnage, he has a duty "to make sure they have everything when they prosecute . . . . That's their job to make sure all of the evidence is obtained." N.T., 5/5/16, at 194.

The trial court denied Appellant's motion to dismiss. As a sanction for the discovery violation, the court ordered that the Commonwealth "be precluded from admitting any evidence . . . regarding Miss Redding's guilty plea, conviction, or sentence at the time of retrial." N.T., 5/5/16, at 215.[22] The court noted that unless Redding appeared at the retrial, it was unlikely that the video recordings of her interviews would be admissible as evidence at trial. Id.

In its Pa.R.A.P. 1925(a) opinion, the trial court explained that it found three instances of prosecutorial misconduct.[23] First, when the prosecutor

_____

[22] Appellant requested that the court not exclude Redding as a witness, as Appellant might wish to use her as a defense witness. N.T., 5/5/16, at 201.

[23] The trial court first explained that the Commonwealth's withholding of the video violated Brady:

> The prosecutor concealed the existence of the evidence by representing that it did not exist to both defense counsel and the [c]ourt. The exculpatory impeachment evidence was a video of a codefendant's statements to police in a case involving a conspiracy. The video showed Codefendant claiming that she was not in Warren County at the time of the Warren County Fair, pleading with officers that she would do anything not to go to

(Footnote Continued Next Page)

assumed that there was no recording of the polygraph, and therefore did not request it from the police, the prosecutor "attempted to discharge the government's Brady responsibility almost entirely through his assumptions." Trial Ct. Op. at 4 (italicization added). According to the court, the prosecutor should have put more effort into determining what evidence existed, as he was on notice of ongoing discovery issues in the area. Id. at 4-5.[24] Second, Gnage misrepresented to the trial court that polygraph examinations are not recorded. Id. at 5-6.[25] Third, in the response to Appellant's motion to dismiss, Gnage argued that Appellant's counsel knew of the existence of the video (whereas Gnage did not), and that counsel intentionally withheld that knowledge when requesting discovery. Gnage also argued in the response

(Footnote Continued) ————————————

> jail, and expressing her hatred for Appellant. Under the circumstances, the evidence is exculpatory impeachment evidence. The concealment was prejudicial because it is critical impeachment evidence against a codefendant.

Trial Ct. Op., 7/5/16, at 3. As the Commonwealth did not appeal the grant of a mistrial in this case, and makes no argument on appeal regarding whether a Brady violation occurred, we see no reason to disturb this portion of the trial court's analysis.

[24] The trial court also noted that the procedure whereby the prosecutor requested discovery material through Osborne rather than directly from Zeybel was problematic. Trial Ct. Op. at 5.

[25] At the hearing, the trial court admonished,

> When an officer of the court makes a representation . . . to me, I am operating with the understating that he knows that. He has researched that. He has spoken to the individual that could give him a definitive answer in that regard, and that's why I am hearing it in the middle of a trial.

(Footnote Continued Next Page)

that the video did not contain Brady material, even though he had never watched the video in full. The court found that Gnage's response was "overly defensive, argumentative, and [involved] rehearsed hindsight-based" contentions. Id. at 6.

However, the court found that dismissal was not warranted based on prosecutorial misconduct because "[a]ll evidence pointed to the prosecutor's gross negligence in making assumptions regarding the existence or non-existence of evidence," and "the panicked response of an inexperienced attorney, who was unwilling to accept responsibility for his mistakes." In the eyes of the court, this conduct did not amount to deliberate overreaching warranting discharge. Trial Ct. Op. at 8-9.

The trial court also reviewed the conduct of the police. On the part of Zeybel, the trial court found:

> This practice of putting a DVD into the file only when there is inculpatory evidence is concerning. The [Pennsylvania State Police] regulations require that the original of all recorded polygraph interviews by placed in the investigating officer's case file. Zeybel's contrary practice functionally placed an extra hurdle to the disclosure of exculpatory interviews through discovery.

Trial Ct. Op. at 7. However, the trial court noted that Zeybel made no effort to hide the existence of the video at trial, and that "he saw no problem with his method because the videos are so rarely admissible and prosecutors will contact him when they need a copy of the video." Id. The court also took

(Footnote Continued) ———————————

N.T., 5/5/16, at 209.

issue with Osborne's failure to memorialize his conversation with Redding in the report, and indicated that Osborne should have been aware that the interview was recorded. However, the court found that while officers are generally aware that Zeybel records his polygraph examinations, it appears that this "is not at the forefront of their minds," and was likely not at the forefront of Osborne's mind. Id. Overall, the trial court found:

> The issues involving police handling of evidence in the case appear[s] to be a result of a lack of communication and organization. There was no evidence to suggest that there was collusion between the prosecutor and the police. Instead, there appears to be a serious problem of miscommunication and lack of communication between the prosecutor and police.

Id. at 10. The court also noted that it had no precedent on which to base dismissal of the charges based on police misconduct, rather than actions by the prosecutor alone. Id.

Appellant filed a timely appeal,[26] stating the following issue: "Did the [t]rial [c]ourt err by abusing its discretion when it denied Appellant's Motion to Dismiss based upon double jeopardy when the actions of the First Assistant District Attorney combined with that of the Pennsylvania State Police regarding exculpatory evidence rose to the level of more than gross negligence?" Appellant's Brief at 7.

_____

[26] Although it denied Appellant's motion to dismiss, the court made an explicit finding on the record that the motion was not frivolous. Therefore, pursuant to Pa.R.Crim.P. 587(B), the order denying the motion is immediately appealable as a collateral order. Commonwealth v. Graham, 109 A.3d 733, 735 n.1 (Pa. Super.), appeal denied, 126 A.3d 1282 (Pa. 2015).

In Commonwealth v. Graham, 109 A.3d 733 (Pa. Super.), appeal denied, 126 A.3d 1282 (Pa. 2015), we stated:

> An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is de novo. To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings:
>
>> Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

Graham, 109 A.3d at 736 (brackets and citation omitted).

Appellant argues that dismissal is warranted, as there was misconduct by both the prosecutor and the police. With regard to the prosecutor, Appellant points to the same three instances of misconduct found by the trial court, but argues that the prosecutor acted intentionally in each instance. First, as to the withholding of evidence, Appellant claims that even though Gnage knew of the ongoing discovery issues between prosecutors and the police, he "continued to act in a lackadaisical manner when it came to making sure discovery was complete and provided to Appellant"; according to Appellant, this was intentional neglect by the prosecution. Appellant's Brief at 14-15. Second, Appellant complains of the misrepresentation Gnage made to the court at sidebar regarding the recording of polygraph examinations without having any basis for such a statement. Third,

regarding the Commonwealth's response to the motion to dismiss, Appellant complains that notwithstanding Gnage's admission at trial to a Brady violation, the Commonwealth nonetheless argued that the videos were subject to a discretionary discovery rule; this shows "a denial of culpability which is not a negligent, but intentional act." Id. at 15. Appellant also complains that Gnage intentionally argued that there was no Brady violation when he had not even seen the contents of the video. Id. at 16. Appellant contends that "[c]ontinued misconduct must reach the point where it can no longer be deemed grossly negligent." Id.

As for police misconduct, Appellant contends that Corporal Zeybel intentionally withheld evidence. Zeybel, Appellant argues, is "a seasoned, experienced, and tenured police officer who has made the conscious decision to withhold evidence that is not incriminating," and "clearly ignored the exculpatory and impeachment evidence on the video." Appellant's Brief at 17. Appellant points out that Zeybel testified that he intentionally ignores the police regulation mandating the disclosure of videos so as not to have them become a "thorn" in the side of the police, and that he puts only recordings of inculpatory statements into evidence. Id. While Zeybel summarized the contents of the interview in the police report, Appellant notes that he did not indicate that the interview was recorded, and did not mention in the report any of the statements made by Redding against Appellant. Id. Similarly, Appellant asserts that it is unlikely Trooper Osborne did not know that his interview of Redding was being recorded; and yet, he

failed to memorialize it. Such conduct, Appellant argues, demonstrates a brazen and blatant disregard for police procedure. Appellant's Brief at 18. Despite his discovery requests, Appellant points out that had his counsel not specifically asked whether a recording existed on Zeybel's cross-examination, none would have come to light.

Appellant argues that the misconduct by Osborne and Zeybel should be imputed to the prosecutor for purposes of a double jeopardy analysis, since Brady violations apply to exculpatory evidence withheld by police agencies. Appellant's Brief at 19 (citing Commonwealth v. Burke, 781 A.2d 1136, 1142 (Pa. 2001)). Appellant also argues that —

> The District Attorney's Office and the Pennsylvania State Police are regularly and collectively known as the Commonwealth. The Commonwealth is charged with the duty to uphold the Constitution and ensure a fair trial. That includes the police. As the District Attorney is the chief law enforcement officer, the other law enforcement falls under his direction, thus the District Attorney is capable of establishing procedures and regulations to ensure that all Constitutional mandates are being followed.

Id. (citation omitted).

The Commonwealth does not directly respond to Appellant's contentions that police misconduct can be attributed to the prosecutor for purposes of double jeopardy. Rather, the Commonwealth argues that Gnage dutifully and conscientiously requested all discovery from the police. Commonwealth's Brief at 17-18. The Commonwealth stresses that the police report summarizes the statements Redding made to Zeybel during the polygraph examination, and that this shows that neither the police nor the

District Attorney's office intended to suppress the recording of the statements. Id. at 19-21.[27] The Commonwealth contends that the remedy fashioned by the trial court is appropriate in this case and will disadvantage the Commonwealth while still allowing "the victims and society [to] have their day in court." Id. at 24-25.

> In assessing a double jeopardy claim, we are guided by the following:
>
> The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Pennsylvania Constitution protect a defendant from repeated criminal prosecutions for the same offense. Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. An error by a prosecutor does not deprive the defendant of a fair trial. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

Graham, 109 A.3d at 736 (quotation marks, brackets, and citations omitted); see Commonwealth v. Smith, 615 A.2d 321, 325 (Pa. 1992); Commonwealth v. Clark, 430 A.2d 655, 658-60 (Pa. Super. 1981).

_____

[27] We deny Appellant's Application to Strike Appendix A of the Commonwealths' Brief. Appendix A contains a few pages of the police report, which Appellant contends were not made part of the certified record. However, the full report was made part of the record, as it was an exhibit to the Commonwealth's response to its motion to dismiss. See Pa.R.A.P. 1921 (stating that the record on appeal will include any papers filed in the lower court).

Under these authorities, whether a dismissal is warranted turns on whether the Commonwealth intended to deprive the defendant of a fair trial. As the Court in Graham explained, dismissal is an appropriate remedy in such a case because a mistrial would be an inadequate remedy for systematic intentional prosecutorial misconduct:

> By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial. As this Court has often repeated, "a fair trial is not simply a lofty goal, it is a constitutional mandate, . . . and where that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity."

Graham, 109 A.3d at 736 (quoting Commonwealth v. Kearns, 70 A.3d 881, 884-85 (Pa. Super. 2013), appeal denied, 84 A.3d 1063 (Pa. 2014)).

On the other hand, as our Supreme Court also has stated:

> Dismissal of criminal charges punishes not only the prosecutor . . . but also the public at large, since the public has a reasonable expectation that those who have been charged with crimes will be fairly prosecuted to the full extent of the law. Thus, the sanction of dismissal of criminal charges should be utilized only in the most blatant cases. Given the public policy goal of protecting the public from criminal conduct, a trial court should consider dismissal of charges where the actions of the Commonwealth are egregious and where demonstrable prejudice will be suffered by the defendant if the charges are not dismissed.

Burke, 781 A.2d at 1144 (quoting Commonwealth v. Shaffer, 712 A.2d 749, 752 (Pa. 1998)).

Here, the alleged prosecutorial misconduct consisted of a Brady violation that was caused by failures on the part of both the police and the prosecutor. We have no question that if a Brady violation is committed by a prosecutor, it can result in a dismissal on double jeopardy grounds if it is shown that the prosecutor intended to deprive the defendant of a fair trial. See, e.g., Kearns, 70 A.3d at 886 (applying double jeopardy analysis to discovery violation by examining prosecutor's intent to suppress evidence).[28] Although we have found no instance in which we have held that intentional misconduct by the police also should warrant dismissal of the charges under a double jeopardy analysis, we see no reason to foreclose that possibility. Prosecutors must perform their duties under Brady in conjunction with the police, and a Brady violation may occur where evidence in the possession of the police is not disclosed to the defendant, even if the prosecutor did not know about it. See Burke, 781 A.2d at 1142.[29] Thus, the police violate Brady when they destroy or fail to preserve

_____

[28] Conversely, without proof of such intent, "[o]rdinarily, the dismissal of charges is 'a penalty far too drastic' for a prosecutor's violation of discovery rules." Commonwealth v. Anderson, 38 A.3d 828, 840 n.5 (Pa. Super. 2011) (en banc) (quotation marks and citation omitted); see also Commonwealth v. Moose, 602 A.2d 1265 (Pa. 1992) (holding that prosecutorial misconduct founded on mere "willful" discovery violation was insufficient for discharge).

[29] Two reasons have been given for applying Brady to files within police custody: (1) "prosecutors have the authority to determine the procedures under which police provide them with evidence, so they have the ability to ensure they are aware of any Brady material and avoid accidental violations;" and (2) —
(Footnote Continued Next Page)

exculpatory evidence, regardless of intention. Commonwealth v. Snyder, 963 A.2d 396, 406 (Pa. 2009).[30] Police also violate a defendant's due process rights when they destroy "potentially useful" evidence, and do so in bad faith. Id. Police have an obligation to preserve evidence in "that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id. at 402 (quoting Arizona v. Youngblood, 488 U.S. 51, 57 (1988)).

Even recognizing the important role of the police in disclosing Brady material, however, there may be no double-jeopardy dismissal if their misconduct is unintentional or if it does not lead to intentional misconduct of the prosecutor. A leading case is Burke. During the course of trial, the prosecutor discovered evidence in a police file, including a statement made by the defendant, and an exculpatory statement made by the

(Footnote Continued) ————————————

> to de facto permit police to decide what material to place within the ambit of Brady based on what evidence they choose to turn over to prosecutors would "substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."

Commonwealth v. Simpson, 66 A.3d 253, 267 (Pa. 2013) (quoting Burke, 781 A.2d at 1142); see also Lambert, 884 A.2d at 854 ("the prosecution's Brady obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution"; emphasis added).

[30] The federal cases cited by the Court in Snyder generally refer to the prosecutor and the police together as "the government," "the prosecution," or "the State."

Commonwealth's chief witness. The trial court granted the defendant's motion to dismiss based on the discovery violation, noting that the prosecutor was "grossly negligent" in not uncovering the statements earlier, and that the error which had led to their suppression was within the Commonwealth's control. We reversed, and the Supreme Court affirmed our decision. The Supreme Court determined that dismissal was inappropriate because there was no evidence of deliberate, bad faith overreaching by the prosecutor. And the Court described the police misconduct in terms equivalent to negligence:

> Rather than prosecutorial misconduct, it appears that this case primarily involves miscommunication between the police departments involved in the investigation and/or police mishandling of the evidence. The materials were compiled by the Ohio Township police. The Allegheny County police, however, assumed jurisdiction over the investigation several hours after the incident. The prosecutor relied exclusively upon the Allegheny County police to supply her with evidence responsive to the defense's discovery requests. The prosecutor suggested that there may have been some confusion between the departments as to whether the Ohio Township police had, in fact, turned over the items in question to the Allegheny County police. It was also suggested that [the witness's] handwritten statement may have been misfiled by the Allegheny County police in a file on an unrelated matter involving the Mardi Gras restaurant. Whatever may have been the reason for the nondisclosure here, it is apparent from the record that it did not result from deliberate misconduct by the prosecutor designed to compel [the defendant] into moving for a mistrial or to deprive [him] of a fair trial.

Burke, 781 A.2d at 1145-46. There was no allegation in Burke that the police intentionally suppressed evidence. See also Commonwealth v. Wood, 803 A.2d 217, 222 (Pa Super. 2002) (remanding for evidentiary

- 27 -

hearing on whether prosecutor acted intentionally when failing to provide exculpatory evidence in the possession of the police, without addressing whether police intentionally withheld the exculpatory material).

Burke guides our disposition of this case. The trial court found that the prosecutor was negligent in his understanding of whether polygraph examinations were recorded, in his request for such a recording from the police, and in the misrepresentations he made to the trial court regarding the existence of such a recording. We defer to the trial court's credibility determination in concluding that the prosecutor erred, but did not intentionally subvert the court process. Graham, 109 A.3d at 736. The record supports the trial court's determination that the prosecutor did not act intentionally or otherwise in bad faith. Therefore, the prosecutor's misconduct did not rise to the level of a double-jeopardy violation justifying a dismissal.

Similarly, although the law enforcement officers in this case made several errors, the trial court credited their testimony that they did so unintentionally. Trooper Osborne explained that he accidentally did not include his post-polygraph interview with Redding in the police report or his testimony at Appellant's trial, and that he did not know a recording existed. The trial court found him to be truthful. Corporal Zeybel testified that he did not know that Redding was implicated in Appellant's case, and was forthright about his polygraph procedures; the trial court found he was not acting in an effort to sabotage Appellant's case. In light of these findings, we agree with

the trial court that the remedy of dismissal in this case would be overly harsh and would not promote the goals contemplated by discharge under double jeopardy, foreclosing systematic maltreatment. Graham, 109 A.3d at 736. Miscommunication between the police and the prosecutor, alone, cannot be the basis for misconduct. Burke, 781 A.2d at 1145-46.

Of utmost concern, however, is Corporal Zeybel's admission that he enters only those recordings into evidence that include inculpatory, and not exculpatory, statements; that he does so in order that the multitudinous recordings will not become a "thorn" in the side of the state police; and that he does so in open contravention of police regulations. These actions are intentional. However, absent a showing that Corporal Zeybel intentionally withheld or destroyed evidence in Appellant's case in an attempt to deprive Appellant of a fair trial, we agree with the trial court that dismissal is not the appropriate remedy. We trust that measures have been taken that will guarantee that complete discovery is disclosed to criminal defendants in all future cases, including all exculpatory material pursuant to Brady v. Maryland.

Because the trial court found that there was no intentional misconduct or intent to deprive Appellant of a fair trial, and because those findings are supported by the record, we affirm its holding that Appellant is not entitled to have the charges against him dismissed on double jeopardy grounds.

Order affirmed. Motion to strike denied.

Judge Olson joins the opinion.

Judge Ransom files a dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/27/2017