J-A30005-18

2019 PA Super 137

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| AL-TARIQ SHARIF ALI BYRD | : | |
| | : | |
| Appellee | : | No. 468 WDA 2017 |

Appeal from the Order March 20, 2017
in the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0014138-2016

BEFORE:    SHOGAN, J., KUNSELMAN, J. and STRASSBURGER, J.*

DISSENTING OPINION BY STRASSBURGER, J.:

FILED: April 29, 2019

I respectfully dissent. I do not believe the record supports the conclusion that the assistant district attorney, Larry Sachs, engaged in intentional prosecutorial misconduct such that he intended to prejudice Al-Tariq Sharif Ali Byrd (Byrd) to the point of a denial of a fair trial.

The learned Majority aptly covers the procedural history of this case. I add only that upon the trial court's original declaration of a mistrial, the trial court specifically declined to designate the conduct at issue as prosecutorial misconduct.[1] *See* N.T., 12/1/2016, at 26-27 (declaring a mistrial and denying

---

[1] Moments earlier, the trial judge indicated her intent to report Attorney Sachs to the disciplinary board, stating, "**I can no longer trust you. I find you to be sneaky. I find you to be able to backdoor people**, and you're not allowed in my courtroom." *Id.* (emphasis added). Even assuming *arguendo* that Attorney Sachs had engaged in conduct that violated the Rules of

*Retired Senior Judge assigned to the Superior Court.

request of Byrd's standby defense counsel to "attach prejudice to its mistrial declaration"). *Id.* at 27. On the date scheduled for the new trial, however, the trial court began the case by expressing "[its] belief [that] upon reviewing the case law [the case] cannot be retried…." N.T., 2/13/2017, at 2. At the Commonwealth's request, the trial court agreed to review transcripts of three calls between Byrd and Ms. Wilson introduced by the Commonwealth, and continued the hearing for another date in order to receive testimony from Ms. Wilson. *Id.* at 3-7. At the March 20, 2017 hearing, Ms. Wilson finally testified under oath, and the trial court changed its ruling to a dismissal with prejudice.

It is that ruling that the Commonwealth asks us to review. "Article I, § 10 … bars retrial … when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." ***Commonwealth v. Adams***, 177 A.3d 359, 371(Pa. Super. 2017) (distinguishing between prosecutorial error that could be corrected in a future trial versus intentional subversion of the court process, which bars retrial).

Ms. Wilson was a potential character witness for Byrd, identified by Byrd mid-trial when Byrd, operating *pro se*, asked for the court's assistance in contacting Ms. Wilson to testify as a character witness on his behalf. N.T.,

---

Professional Conduct, I find it troubling that the trial judge opted to voice her personal feelings about Attorney Sachs on the record. This particularly concerns me since this Court twice has had to take the extraordinary step of ordering the recusal of this particular jurist due to the personal animus she has demonstrated towards the attorneys appearing before her. ***See*** ***Commonwealth v. Bernal,*** 200 A.3d 995, 1001-03 (Pa. Super. 2018); ***Commonwealth v. McCauley,*** 199 A.3d 947, 952-954 (Pa. Super. 2018).

11/28/2016 – 11/30/2016, at 166-171. Despite the overall tenor of the trial court's commentary regarding Attorney Sachs's actions, I note that the Commonwealth is not prohibited from contacting and interviewing an unrepresented third party, even if the third party is a possible defense witness.

For purposes of double jeopardy, the proper focus is on Attorney Sachs's intent, not the effect of his words on Ms. Wilson. *See Commonwealth v. Smith*, 615 A.2d 321, 324 (Pa. 1992) (holding that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial "when prosecutorial misconduct **is intended** to provoke the defendant into moving for a mistrial" or "when the conduct of the prosecutor is **intentionally undertaken** to prejudice the defendant to the point of the denial of a fair trial") (emphasis added); *Adams*, 177 A.3d at 372 (holding that "whether a dismissal is warranted turns on whether the Commonwealth intended to deprive the defendant of a fair trial").

It is unclear whether the trial court appreciated that the focus should properly be on the prosecutor's intent, not the victim's reaction. Although the trial court found Attorney Sachs's actions to be "knowing and deliberate and [] intended to deprive [Appellant] of a fair trial," in doing so, the trial court judged his words by Ms. Wilson's reaction. *See* Trial Court Opinion, at 13 (focusing on how Attorney Sachs's actions "left [Ms. Wilson] scared, feeling threatened[,] and afraid of retaliation against herself and her family by [Attorney] Sachs"). In fact, at the time it declared a mistrial, the trial court

candidly stated that it believed "**that [it was] the perception of the witness in this case that matter[ed]**, and her perception is that [Attorney] Sachs and/or the [district attorneys' office] is corrupt, possibly she was afraid for her life and for her children, and the witness has not appeared." N.T., 12/1/2016, at 26 (emphasis added). Yet the trial court does not appear to consider that Ms. Wilson could have perceived Attorney Sachs's comments differently than he intended them. *See Commonwealth v. Lafferty*, 461 A.2d 1261, 1263 (Pa. Super. 1983) ("Although the effect of the improper statements was prejudicial, it cannot automatically be concluded that they were made with that intent, particularly in light of the strength of the prosecution's case at the outset."). The standard requires consideration of the prosecuting attorney's intent in making the comments, not simply whether the receiving person subjectively or even objectively felt threatened by the comments.

The Majority and the trial court take specific issue with Attorney Sachs's questioning of Ms. Wilson "regarding her knowledge of [Byrd]" and his prior criminal acts, Majority at 14, but I do not think it is unreasonable for the prosecuting attorney to probe the foundation upon which a character witness's intended testimony would be built. They also take issue with Attorney Sachs's informing Ms. Wilson of Attorney Sachs's perception of Byrd's dangerousness. However, it stands to reason that the average person would not be surprised to learn that the prosecuting attorney believed Byrd to be dangerous;

otherwise, the Commonwealth would not be prosecuting him for firearm-related crimes and rape.[2] Furthermore, Attorney Sachs based his comment upon Byrd's prior criminal history.

The Majority and trial court also emphasize Attorney Sachs's statement that he knew more about Ms. Wilson than he should. While it is understandable why Ms. Wilson may have felt alarmed by this statement, this does not mean automatically that Attorney Sachs delivered the statement with the intent to threaten Ms. Wilson. In fact, the record is clear that the statement referenced knowledge Attorney Sachs gained about Ms. Wilson from recordings of telephone calls between her and Byrd at the jail.

In her voicemail to the trial court, Ms. Wilson said this of Attorney Sachs's statement:

> I advised him that I only knew Mr. Byrd for a few months before he got re-incarcerated. He cut me off and was like, yeah, I know a lot about you. He talked about the fact of my financial hardship, about a break-up, and told me that he knows a lot more about me than he should, which really freaks me out because that means

---

[2] In addition to the persons not to possess charge in this case, the Commonwealth was in the midst of prosecuting Byrd for a multitude of other charges. At docket number CP-02-CR-2875-2015, the Commonwealth had charged Byrd with persons not to possess firearms, carrying a firearm without a license, three counts of possession with intent to deliver, and three counts of possession of controlled substance. At docket number CP-02-CR-3369-2016, the Commonwealth had charged Byrd with rape (unconscious victim), two counts of involuntary deviate sexual intercourse (unconscious victim), two counts of aggravated indecent assault (unconscious victim), two counts of terroristic threats, stalking, indecent assault (unconscious victim), invasion of privacy, and persons not to possess firearms. As the Majority explains, the persons not to possess firearms charge originally listed at docket number 2875-2015 was severed from the rest of the case and re-captioned at docket number 14138-2016.

I'm being watched at this point just for being in contact with Mr. Byrd.

N.T. 12/1/2016, at 8.

During her testimony before the trial court, Ms. Wilson again mentioned Attorney Sachs's statement. When asked if Attorney Sachs had threatened her during the call, Ms. Wilson responded as follows.

> It was more indirect. He stated things like: Yeah. I know a lot more about you than I should. Kind of like a chuckle. He hinted on knowing my situation with a case that I had against my ex. He stated about my financial situation. So I didn't put two and two together that he got it from [the] phone calls [between Byrd and me at the jail]. I immediately went into: Oh, my God. I am being watched. What does he know about me? I tried to play kind of coy with him, like I was on his side to try and find out what he knew about me. So he asked where I worked, and I told him, because it's public knowledge where I work. But he just continued to be like: Oh, yeah. Like he said two or three times: I know more about you than I probably should, and he chuckled.

N.T., 3/20/2017, at 5-6.

Attorney Sachs does not deny that he made the statement about knowing too much about Ms. Wilson. During his testimony, the following exchange occurred.

> [Byrd's standby counsel:] [Attorney] Sachs, in that recording, … I believe it was your conduct that was going to be directed towards her in relation to knowing about her family. Did you reference the jail recordings that you had listened to in relation to [] Byrd's case?
>
> [Attorney Sachs:] I believe I told her that that's how I -- why I knew about her, what I knew about her. I mean I never told her that she was under surveillance. She wasn't under surveillance. Everything I know about her is from having had to listen to these jail recordings [between her and Byrd].

[Byrd's standby counsel:] But you had, in fact, told her several things about her family, and you told her that you knew more information about her than you should? Did you say that to her?

[Attorney Sachs:] In response to when she was telling me about herself, I said, yes, I know about these things. I know about this. I know about that. It was all as a result of listening to these recordings. That's why I know more about her than I should.

[Byrd's standby counsel:] You did, in fact, use those words in speaking with the witness?

[Attorney Sachs:] Yes. I believe I did. Yes.

N.T., 12/1/2016, at 24-25.

Even if Attorney Sachs went too far in editorializing about Byrd's alleged dangerousness, or in flippantly remarking to Ms. Wilson that he knew more about her than he should, I do not believe that his statements were made with intent to subvert the court process and to prejudice Byrd to the point of a denial of a fair trial. The Majority and trial court conclude Attorney Sachs intended to scare Ms. Wilson from testifying as a character witness for Byrd. I disagree. What would be the point? Attorney Sachs already knew from listening to the jail calls between Ms. Wilson and Byrd that Ms. Wilson did not know Byrd very long. It would be easy enough on cross-examination to challenge her testimony regarding his law-abiding or peaceful reputation with questions regarding her knowledge of his prior convictions. **See Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1263 (Pa. Super. 2014) (stating that prior criminal convictions are admissible as rebuttal evidence of good character).

- 7 -

Furthermore, this was not a complicated case. Although it is possible evidence of Byrd's good character could engender reasonable doubt in the mind of the jury regarding the charge of person not to possess a firearm, multiple police officers identified Byrd on the stand and testified that they found Byrd with a gun on the front seat of his car, which was prohibited by his prior conviction for aggravated assault.

Moreover, the record is clear that because Ms. Wilson believed she could lose her job if she missed work, she was not planning to testify, except possibly if forced to do so by subpoena. Ms. Wilson told Attorney Sachs this at the outset of the conversation. *See* N.T., 12/1/2016, at 5-6 (Ms. Wilson's voicemail message to trial court stating she told Attorney Sachs that "because [she was] a new employee that [she] couldn't come in because of the simple fact that [she] was going to get fired" and she would need a subpoena); *id.* at 18-19 (testimony of Sachs that Ms. Wilson "said that she couldn't get off work, and she couldn't afford to lose her [new] job"); Commonwealth Exhibit 3 (N.T., 11/30/2016, at 15) (jail call between Byrd and Ms. Wilson, where Ms. Wilson told Byrd that she had told Attorney Sachs that she "can't come" because her "supervisor [had told her] no," she did not have a subpoena, and it was "too short of a notice"); *id.* at 14-15 (jail call between Byrd and Ms. Wilson, where Byrd suggested that she would have tried harder to come to testify if it were not for Attorney Sachs's call, and Ms. Wilson responded, "No,

there's the thing. Like [Attorney Sachs] asked me if I was coming, and I was like … I can't because of my job").[3]

Because Ms. Wilson was not planning to attend even before Attorney Sachs called her, I am not convinced that Byrd was prejudiced to the point of an unfair trial. In addition to Ms. Wilson's clear statements about her desire not to attend trial made to Attorney Sachs and court staff, the transcript of the jail calls between Byrd and Ms. Wilson introduced by the Commonwealth is revealing.

> MS. WILSON: But like I … tried to tell that … lady, I was like, … I will ask and I will find out. … **But most likely …, unless I have a doctor's excuse or, like, a subpoena, I was like, I'm not going to be able to miss work because I'm still in my first 90 days.** And I said, [s]end me all the information to my e-mail address. I gave her my e-mail address. And I told her, I said, on my next break, … I'll be able to call you and let you know. I said, I don't go on break until probably like 4:00. So I go on break to call her to tell her what my supervisor said, and nobody answered. So I go back to my desk, and I was going to e-mail her, and as soon as I sat down back at my desk, … Larry Sachs called me. And I was like … [w]hy are you calling me? And he was like, Oh, well, you know, it's been addressed that you're going to be appearing for -- for -- to be a -- oh, my God, I can't even recall now.
>
> MR. BYRD: A character witness.

---

[3] Ms. Wilson's statements to Attorney Sachs are consistent with Ms. Wilson's statements to court staff. *See* N.T., 12/1/2016, at 5 (Ms. Wilson's voicemail message to trial court stating she had told the court's staff that she "wasn't sure if [she] was able to make it simply because [she's] a new employee at her job"); Commonwealth Exhibit 3 (N.T., 11/30/2016, at 11-15) (jail call between Byrd and Ms. Wilson, where Ms. Wilson told Byrd that she had told court staff that she would not miss work to testify without a subpoena); N.T., 3/20/2017, at 4 (testimony of Ms. Wilson that she had told the trial court's staff that she "wasn't sure [if she could testify], because [she had] just started [her] job and [she] didn't know if they were going to give [her] the time off").

MS. WILSON: Okay, yeah, a character -- … I told the lady that I would let her know. **I was like … I can't come.  My supervisor told me no but it's -- like I don't have a subpoena. I was like -- and I told him, I said, it's too short of a notice.** I have to have all my days requested in before I started my first day of work. I had to have everything approved.  And he was like, Oh. And then proceeds to tell me about all this stuff about, oh, yeah, I'm glad you found a job. I know you've been having financial hardship.  I was like, Excuse me?

MR. BYRD: Mm-hmm. Go ahead. I'm listening.

MS. WILSON: Yeah. I was just like, Are you -- like he -- he knows everything about me, which makes me, like … why are you watching me?  And he was like, you know, you seem like you're a really good person, and he was like, so, you know, you just -- basically, like – it's just a bunch of BS, but I -- I don't know.  But I told your mom because I wanted your mom to tell you because I didn't think you had any phone time to call me.

MR. BYRD: Yeah, well, you can tell me, because the phone is recorded, and if I need to subpoena it, then that's what I'll do.

MS. WILSON: There's not enough time now.

MR. BYRD: Yes, it is. Just keep talking.

MS. WILSON: Oh, well -- I don't know.  I was just saying because -- I was just like basically letting him know that I couldn't make it.  You know, and what makes me mad is that why would she -- like, why would that lady go (indiscernible)? (Indiscernible) if I didn't tell her (indiscernible).

MR. BYRD: That lady -- that lady didn't do that. That lady didn't do that. Listen, let me explain to you something. First and foremost, you're not obligated to Larry Sachs. Larry Sachs is a district attorney. He's the opposition in an adversarial process where they're trying to prosecute one of your people.  You are a character witness on my behalf because he's in the courtroom trying to make it seem like I'm just a devil, a monster or something in an indirect way, and I wanted to paint a different picture for the jury ….

\*\*\*

If I win this case, I'm going to be all over the news and be famous. Just watch.  You don't have to come. I'm not mad if you don't come or none of that, baby.  I'm not trippin' at all, because I'm going to beat them with or without you, but I just was giving you an opportunity to be a part of it because I love you and it would have helped me close them out real good.  At the end of the day, I don't have to have that, though. **It helps me for the simple fact that he reached out and tried to scare you up and tell you all type of derogatory things about me that he can't prove and that are not true.** Since he did that, it let me know that he's in panic mode, and he knows he lost the case for real for real. That's what it let me know.

MS. WILSON: **Well, the only thing is, I can't -- I can't come is simply because I can't lose my job.**

MR. BYRD: Right.

MS. WILSON: You know, that's the whole thing.  Like I can't lose my -- I can't lose my job.

MR. BYRD: No. You're not --

MS. WILSON: And, like, she straight up told me. She was like --

MR. BYRD: -- not saying. You're not --

MS. WILSON: I understand. I'm just letting you know. Just letting you know.

MR. BYRD: No, no, no. I'm saying – **let me let you know. Let me be in control of the conversations for this time right here. You're not coming to the thing, and I know that he scare you, Brandi. I know that he spooked you with that bullshit.**

MS. WILSON: **That's not why, though.**

MR. BYRD: It's --

MS. WILSON: I support --

MR. BYRD: **Why don't you just listen sometime, baby. You don't have to chime in every time, if you just listen to me, you read between the lines and understand.**

MS. WILSON: Yeah.

MR. BYRD: **If you let these people know -- if you even called the lady back that called you and tell them that he called you and said all those derogatory things and he threatened you and he scared you and that's why you're not coming, it helps me.** Are you not –

MS. WILSON: Yeah, I know.

MR. BYRD: **So why would you say it's because you can't come to work?**

MS. WILSON: Because I – everybody already know. Like I left a message for that lady letting her know, like, I can't come in because –

MR. BYRD: But if dude would have never would have called you, I think you would have made a bigger and a better effort to make sure you could try to get there. Being that he did that and said I was -- what all did he say? Put it on the record so I can use this call. Put it on the record.

MS. WILSON: No, there's the thing. Like he asked me if I was coming, and I was like, well … I can't because of my job. And he was like, Oh, well such-and-such said that you said that you were going to be there. And I was like, I tried to call her back. **I said, I called the number to try to call her back to let her know that I wasn't coming.** And he's just like, oh, (indiscernible).

Commonwealth Exhibit 3 (N.T., 11/30/2016, at 11-15) (emphasis added).

The conversation between Byrd and Ms. Wilson leaves one with the inescapable conclusion that Byrd was capitalizing upon Ms. Wilson's general uneasiness over her conversation with Attorney Sachs. Byrd evinces a clear intent to convince Ms. Wilson that not only did Attorney Sachs threaten her,

but that she should report it to the trial court so that he could use the information to his advantage. He is the first one to use the word "threatened." He is the one who suggested to Ms. Wilson that she say she was not coming because of Attorney Sachs, not because her supervisor told her she could not miss work to testify without a subpoena.

Moreover, the conversation underscores that Ms. Wilson was not planning to attend the trial without a subpoena before Attorney Sachs even called her. Since Ms. Wilson told Attorney Sachs this at the outset of their call, I am not convinced that he would intentionally subvert the court process over a character witness who was not planning to attend. Simply put, Attorney Sachs had little to gain by engaging in nefarious conduct.

In my view, the evidence falls short of supporting a finding of intentional subversion of the court process and instead looks like the mishandling of a witness interview with poor people skills. Attorney Sachs was forthcoming regarding his conversation with the witness, and there is little dispute regarding the contents of the conversation. His conduct here simply is not comparable to the type of conduct at issue in other cases involving interviews of witnesses where double jeopardy attached. ***See, e.g., Commonwealth v. Anderson***, 38 A.3d 828, 839 (Pa. Super. 2011) (*en banc*) (holding double jeopardy barred retrial based upon prosecutor's intent to taint a child witness subversively; prosecutor met with a child witness without a third party present in violation of a prior court order, spent hours with the child in advance of a

competency hearing, told the child both the questions he would be asked and the answers the child should provide, asked those questions at the competency hearing, and lied about his meeting with the child).

Without the requisite intent by Attorney Sachs, double jeopardy does not attach. *See Commonwealth v. Rightley*, 617 A.2d 1289, 1294 (Pa. Super. 1992) ("Unless the conduct, while perhaps reprehensible, is actually designed to demean or subvert the truth seeking process, *Smith* will not apply to bar a retrial."). Therefore, I would reverse the trial court's ruling and permit the Commonwealth to re-try Byrd.