J-S18020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAWN MICHAEL BOOK, | : | |
| | : | |
| Appellant | : | No. 1126 WDA 2017 |

Appeal from the Order July 20, 2017
in the Court of Common Pleas of Butler County,
Criminal Division at No(s):  CP-10-CR-0000630-2016,
CP-10-CR-0001483-2015

BEFORE:  STABILE, J., MUSMANNO, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY MUSMANNO, J.:                **FILED JUNE 27, 2018**

Shawn Michael Book ("Book") appeals from the Order denying his Motion to bar a retrial, following the declaration of a mistrial in Book's second jury trial.[1]  We affirm.

In its Opinion, the trial court described the history underlying the instant appeal, which we adopt as though fully restated herein.  **See** Trial Court Opinion, 7/20/17, at 1-15.

---

[1] This is an interlocutory appeal as of right.  **See Commonwealth v. Hallman**, 67 A.3d 1256, 1260 (Pa. Super. 2013) (recognizing that "a defendant can immediately appeal as of right an order that denies a non-frivolous motion to dismiss on state or federal double jeopardy grounds.").

Book's first jury trial, on the charges of burglary[2] and related crimes, ended in a mistrial.[3]  During his second jury trial, three incidents took place, culminating in the trial court's declaration of a mistrial, *sua sponte*.  First, Commonwealth witness Toni Arnold ("Arnold") improperly referred to Book's prior incarceration, after which the trial court denied Book's Motion for a mistrial.  ***See*** N.T., 4/17/17, at 226-27.  Second, Book's wife, Michelle Book ("Michelle"), another Commonwealth witness, testified regarding privileged communications between her and Book.  ***See*** N.T., 4/18/17, at 56-58.  Counsel for Book objected to the testimony.  ***Id.*** at 57-58.  The trial court did not rule on the objection, but no further testimony regarding the discussion took place.[4]  Third, it was discovered that discovery materials, including a possible recording related to interviews conducted by Master Trooper Dominic Caimona ("Master Trooper Caimona") and Corporal Randolph Guy, were not provided to defense counsel.  ***See*** N.T., 4/18/17, at 189-91 (wherein Michelle testified regarding interviews conducted by the officers, and a subsequent

---

[2] ***See*** 18 Pa.C.S.A. § 3502.

[3] During the first trial, a police officer improperly had testified regarding facts from which it could be inferred that Book had a criminal record.

[4] The trial court requested that the prosecutor provide additional foundation to establish that the conversation was not privileged, *i.e.*, that a third person was present during the conversation.  ***Id.*** at 58.  The prosecutor was unable to provide the necessary foundation.  ***Id.*** at 58-59.

sidebar discussion regarding the possibility of a ***Brady***[5] violation).  This came to light during the testimony of Master Trooper Caimona, who had been called as a witness by Book.  Following the third event, the trial court, *sua sponte*, declared a mistrial, providing the following rationale for its decision:

> [N]umber one, we have the inadvertent[,] but certainly prejudicial[,] blurt out by [] Arnold concerning the fact that [Book] was in prison. Then we have Michelle['s] [] testimony in violation of the spousal privilege[,] and then we have this issue[,] which[,] I think[,] is cumulatively going to make me declare a mistrial at this point.

***Id.*** at 226-27.

Book subsequently filed the instant Motion to Dismiss With Prejudice seeking to bar a third trial.  In support, Book claimed that prosecutorial misconduct caused the prior mistrials, and consequently, a retrial would violate his constitutional protection against double jeopardy.  Motion to Dismiss With Prejudice, 6/6/17, at 1; Brief in Support of Motion, 6/6/17, at 3 (unnumbered).  In an Opinion and Order entered on July 20, 2017, the trial court denied Book's Motion to Dismiss With Prejudice.  Thereafter, Book filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Book presents the following claims for our review:

---

[5] ***See Brady v. Maryland***, 373 U.S. 83, 87 (1963) (holding that the prosecution must disclose evidence favorable to the accused that is material either to guilt or to punishment).

- 3 -

**A.** Whether the [trial] [c]ourt committed an error of law and/or abuse of discretion in denying [Book's] "Motion to Dismiss With Prejudice"?

**B.** Whether the [p]rosecutor and/or other agents of the Commonwealth engaged in prosecutorial misconduct/overreach in the instant case[,] aimed at either forcing [Book] to request a mistrial and/or deny [Book] a fair trial?

**C.** Whether the conduct of the agents of the Commonwealth, namely members of the [Pennsylvania] State Police, should be imputed to the Commonwealth as misconduct barring retrial of [Book]?

**D.** Whether the overreach/prosecutorial misconduct by the Commonwealth/its agents prohibits retrial of [Book] via Pa. Const., art. I, § 10 and U.S. Const., amend. V.[?]

Brief for Appellant at 9 (emphasis omitted, issues renumbered for clarity).

In the Argument section of his brief, Book reduces his claims to the following three issues: (1) whether prosecutorial misconduct, as defined under **Commonwealth v. Smith**, 615 A.2d 321 (Pa. 1980), occurred in the instant case, thereby creating a double jeopardy prohibition of retrial, **see** Brief for Appellant at 19; (2) whether the weight of the evidence in this case indicates that the Commonwealth actors engaged in the prosecutorial overreach proscribed under the **Smith** test and, therefore, the double jeopardy prohibition of retrial is triggered, **see id.** at 39; and (3) whether the trial court should impute prosecutorial misconduct on the part of Pennsylvania State Police personnel to the prosecutor for purposes of double jeopardy analysis, **see id.** at 61.

In assessing a double jeopardy claim,[6] we are guided by the following:

> The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution[,] and Article 1, § 10 of the Pennsylvania Constitution[,] protect a defendant from repeated criminal prosecutions for the same offense. Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. An error by a prosecutor does not deprive the defendant of a fair trial. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

***Commonwealth v. Graham***, 109 A.3d 733, 736 (Pa. Super. 2015) (quotation marks, brackets, and citations omitted).

Thus, whether a dismissal is warranted turns on whether the Commonwealth intended to deprive the defendant of a fair trial. ***Commonwealth v. Adams***, 177 A.3d 359, 372 (Pa. Super. 2017).

> By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial. As this Court has often repeated, a fair trial is not simply a lofty goal, it is a constitutional mandate, … and where that

---

[6] Book does not challenge the trial court's *sua sponte* declaration of a mistrial. Rather, Book challenges the denial of his Motion to Dismiss With Prejudice, based upon a claim of prosecutorial misconduct. "Double jeopardy, as it relates to prosecutorial misconduct, will attach where the prosecutorial misconduct is calculated to trigger a mistrial." ***Commonwealth v. Diehl***, 615 A.2d 690, 693 (Pa. 1992).

constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity.

*Id.* (citations and internal quotation marks omitted). However,

the sanction of dismissal of criminal charges should be utilized only in the most blatant cases. Given the public policy goal of protecting the public from criminal conduct, a trial court should consider dismissal of charges where the actions of the Commonwealth are egregious and where demonstrable prejudice will be suffered by the defendant if the charges are not dismissed.

*Id.* (citations omitted).

In his first issue, Book argues that, where manifest necessity is the result of prosecutorial misconduct, the "***Smith* test**" should be applied, and retrial should be barred. Brief for Appellant at 19. Book asserts that the prosecutorial overreach in this case is similar to the misconduct that occurred in ***Smith***. *Id.* at 25. According to Book, the Commonwealth's case was not proceeding as planned, and a representative from the Pennsylvania State Police, seated at the prosecutor's table, was aware of this. *Id.* Book posits that this created a motive for the Pennsylvania State Police and/or the prosecutor to intentionally inject error into the case, to force Book to choose between opting for a mistrial or obtaining a verdict. *Id.* According to Book, the mistrial was declared during the testimony of Master Trooper Caimona, who had over two hours to prepare for his "eventually-fatal testimony[,] during which he was, by all accounts, in almost constant contact with the officers [and] well aware of the issues which had arisen during the rest of the trial." *Id.* at 26. Book asserts that the purpose of Master Trooper Caimona's

testimony was to create the type of error that would meet the "***Smith*** test." ***Id.***

In his second issue, Book argues that the "weight of the evidence" indicates that the "Commonwealth actors engaged in the prosecutorial 'overreach' proscribed by the ***Smith*** Rule," thereby triggering Book's double jeopardy protections. ***Id.*** at 39 (internal quotation marks and some capitalization omitted). In support, Book directs our attention to inconsistencies in the testimony of other witnesses, which, he claims, established the motive for the Commonwealth to inject error into the case. ***See id.*** at 26-45. Book contends that it would be "ludicrous" to presume that the prosecutor did not make known, to the police witnesses, the negative implications of the "egregiously-lacking investigation," and the "fatal nature" of exposing the shortfalls, inconsistencies, "and outright lies" to the jury. ***Id.*** at 39-40. Book contends that the Pennsylvania State Police witnesses and the prosecutor then acted upon their "perceived need" to inject error into the case. ***Id.*** Book asserts that fatal errors in both trials "have been the direct result of a concerted effort by [Pennsylvania State Police] personnel, and/or the [p]rosecutor, which mirror, in both form and function, the alternative prongs of the '***Smith*** test' …." ***Id.*** at 46.

In its Opinion, the trial court set forth the appropriate law, addressed Book's first two challenges to the denial of his Motion to Dismiss With Prejudice, and concluded that they lack merit. ***See*** Trial Court Opinion,

7/20/17, at 16-18. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis as to Book's claims, with the following addendum.

As our Supreme Court announced in **Smith**, "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." **Smith**, 615 A.2d at 325.

> An example of egregious prosecutorial misconduct which has been deemed sufficient to warrant dismissal may be found in **Smith**. In **Smith**, the Commonwealth deliberately withheld from a capital defendant: (1) the existence of an agreement with its chief witness pursuant to which he received lenient treatment at sentencing on unrelated charges in exchange for his testimony, and (2) material, exculpatory physical evidence that it had discovered mid-trial. The physical evidence consisted of grains of sand that were found between the toes of the murder victim at her autopsy. The sand was consistent with Smith's defense that the crime had been committed in Cape May, New Jersey, by others, and not by him in Pennsylvania, as the Commonwealth had alleged. At trial, when a Pennsylvania state trooper testified on cross-examination that granular particles which looked like sand had been removed from the victim's body, the Commonwealth implied that [the trooper] had fabricated his testimony and the trial prosecutor recommended to his superior that he investigate the feasibility of prosecuting the state trooper for perjury. While the trial was still in progress, the state police discovered the adhesive "lifters" that had been used to remove and retain the sand from the victim's feet. The Commonwealth, however, failed to disclose this evidence and, indeed, continued to suppress the evidence for over two years while the case was on direct appeal to this Court. In light of this deliberate, bad faith failure to disclose potentially exculpatory evidence, this Court discharged Smith under the double jeopardy clause of the

Pennsylvania Constitution, opining that "it would be hard to imagine more egregious prosecutorial tactics." [***Smith***,] … 615 A.2d at 323.

On the other hand, a mere finding of willful prosecutorial misconduct will not necessarily warrant dismissal of charges. For example, in ***Commonwealth v. Moose***, … 602 A.2d 1265 ([Pa.] 1992), [the Pennsylvania Supreme] Court found that the prosecutor's failure to inform defense counsel of a witness's police statement[,] which contained incriminating admissions allegedly made by the defendant[,] amounted to a "willful violation of Rule 305." ***Id.*** at … 1274. The [Supreme] Court held that "the district attorney's conduct raised significant ethical concerns" and referred the matter to the Disciplinary Board for its consideration. ***Id.*** … at 1274 n.8 & 1276 n.12. Nonetheless, the [Supreme] Court did not dismiss the charges against Moose, but rather remanded the matter for a new trial. ***Id.*** … at 1276.

***Commonwealth v. Burke***, 781 A.2d 1136, 1144-45 (Pa. 2001).

In the instant case, the prosecutor's conduct does not approach that of the deliberate, bad faith, prosecutorial misconduct that warranted the dismissal in ***Smith***. Further, the prosecutor's conduct does not even approach the conduct of the prosecutor in ***Moose***. There is no evidence here of deliberate overreaching by the Commonwealth or its witnesses. Although Book offers speculation regarding the motives of the Commonwealth's witnesses, there is no evidence supporting his assertions. Simply put, the errors in this case in no way approach the egregious and intentional nature of the conduct addressed in ***Smith***. Accordingly, we cannot grant Book relief on his first two issues.

In his third issue, Book claims that the conduct and motives of the Pennsylvania State Police witnesses should be imputed to the prosecutor, for

the purpose of applying the **Smith** test. Brief for Appellant at 61. Book contends that the prosecutor should "feel adverse effects from the intentional acts of her fellow Commonwealth Agents in the prosecution of [Book] in now[] two (2) trials." *Id.* at 65.

In **Adams**, this Court recognized the important role that police have in disclosing potentially exculpatory material. **Adams**, 177 A.3d at 373. However, our Court concluded that "there may be no double-jeopardy dismissal if [police] misconduct is unintentional[,] or if it does not lead to intentional misconduct of the prosecutor." *Id.*

Here, the trial court found no evidence that the Pennsylvania State Police witnesses intentionally acted to provoke a mistrial. Trial Court Opinion, 7/20/17, at 17. Further, the trial court found no evidence that would support a finding that Master Trooper Caimona purposefully injected error into the proceedings, based upon an awareness that the Commonwealth's case was not proceeding "as planned." *Id.* Finally, as observed by the trial court, Master Trooper Caimona was called upon to testify *by Book*, and not the prosecutor. *Id.*

Because the trial court found that there was no intentional misconduct or intent to deprive Book of a fair trial, and because those findings are supported by the record, we affirm the trial court's conclusion that Book is not entitled to have the charges against him dismissed on double jeopardy

grounds. We therefore affirm the Order of the trial court, which denied Book's Motion to Dismiss With Prejudice.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2018

IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA          CRIMINAL DIVISION

vs.                                   C.A. No. 1483 of 2015
                                      C.A. No. 0630 of 2016

SHAWN MICHAEL BOOK

For the Commonwealth:     Patricia J. McLean, Esq., First Assistant District Attorney
For the Defendant:        Joel L. Hills, Esq.

Judge William R. Shaffer                              July 19, 2017

## MEMORANDUM OPINION

The Defendant seeks to bar a retrial after the Court declared a mistrial during the second day of a jury trial in the above-captioned cases. The trial was the second jury trial in these cases to conclude in a mistrial. Per the argument of defense counsel, the Defendant seeks to impute actions of the police to the Attorney for the Commonwealth. Such actions by the police, the Defense asserts, were designed either to provoke the Defendant to move for a mistrial or amounted to overreaching such that retrial should be prohibited. The first mistrial was granted at the request of the Defendant after a police officer testified to facts from which it could have been inferred that the Defendant had a criminal record. The second trial ended when the Court declared a mistrial based on the cumulative effects of three discrete incidences that took place during the trial. We will set forth here the testimony and argument surrounding each incident.

The first incident related to testimony by Toni Arnold given during her redirect examination by First Assistant District Attorney McLean:

Q:    All right. You mentioned several times on cross-examination that you have been cousins with the [D]efendant your whole life?

A:    Yes.

Q:    Did your families socialize, do things together at all?

1

A: Yes.

Q: How frequently?

A: Holidays. Any evening, he was at my dad's house all the time. When Shawn was out of prison he would be there, sometimes, or be fishing with my dad.

MR. HILLS: Your Honor, I ask for a sidebar.

THE COURT: Sure.

(Sidebar conference)

MR. HILLS: Your Honor, and the nature of my objection is I'd be requesting a mistrial. The witness based on [Ms.] McLean's questioning just blurted out on the record that when Shawn was out of prison. So people have been in prison, and that implicates his criminal record, and the same reason you granted a mistrial the last time.

4/17/2017 N.T., 226-27. Following the time it was requested, the Court denied the Defendant's request for a mistrial. *Id.* at 227-29. Counsel for the Defendant renewed his request for a mistrial at the close of the Commonwealth's case-in-chief. 4/18/2017 N.T., 187-88.

The second incident involved the testimony of Michelle Book relating to communications between her and the Defendant, her husband. By Order of Court dated October 18, 2016, the Court granted the Defendant's Motion in *Limine* to Exclude Testimony-Marital Privilege, and found inadmissible confidential marital communications between the Defendant and Ms. Book. The following exchange took place during the direct examination of Ms. Book by First Assistant District Attorney McLean:

Q: Did you meet up with them at any point?

A: I did.

Q: About where?

A: Where they went where the road "Y'd" there was a stop sign further down

2

maybe close to a mile, I would estimate, and they made a left-hand turn. They pulled over further down the road. After they made the left-hand turn that's where I met up with them at.

Q: Did you measure that mileage?

A: I did not.

Q: When you met up with them, what was Shawn's demeanor at that time?

A: He was injured. He was, hard to breathe. He was anxious and angry. Upset. Scared.

Q: And did you, well, and what happened then? You met up with them, he's injured, what happened?

A: I asked what happened, and Shawn told me that when he went into the home he had opened a door and there was a gentleman in there and that once he saw the gentleman he had to try to hurry up and get out of the house and he fell off of a balcony or a deck.

MR. HILLS: Your Honor, may I have a sidebar, please.

(Sidebar conference)

MR. HILLS: If you remember correctly, I made a motion to suppress all of the confidential communications and I believe that's what she's testifying now about, you know, marital communication between her and Shawn, and I believe that you granted my motion, that that shouldn't be introduced.

MS. MCCLEAN: At the time he made that motion that all communicating between husband and wife is confidential this clearly is not confidential. Toni Arnold was there. She's part of the co-conspiracy. There's a third person there. There is nothing confidential about this at all.

MR. HILLS: I don't believe that was made clear, Your Honor.

THE COURT: What wasn't made clear?

MR. HILLS: That these communications weren't made between her and Shawn alone and Toni was there. She simply said what was recounted to her by Shawn.

3

There was no foundation laid as to who else may or may not have been there.

THE COURT: I don't recall that that was established, [Ms.] McLean, that there was a third person present, so.

MS. MCLEAN: All right.

THE COURT: Maybe go back and revisit that issue.

(End of sidebar conference)

Q: [Ms.] Book, when you, and when you met up with Toni and Shawn, do you guys stay together for a little while?

A: No.

Q: What happened?

A: Shawn got into the Kia that I was driving.

Q: And was it just the two of you in that vehicle then?

A: It was.

Q: Can you describe his demeanor without telling me what he said?

A: Anxious. Irritated. Scared. Angry. Hurt.

Q: And were those things that you observed?

A: Yes, Ma'am.

4/18/2017 N.T., 56-59. The testimony of Ms. Book concerning the communications made by the Defendant to her while the two were alone should not have been admitted pursuant to the October 18, 2016 Order of Court. Counsel for the Defendant properly objected to the testimony.

The third incident concerned discovery materials requested by the Defendant and which, it appeared at the time of trial, had not been provided. The materials concerned the memorialization or recordings of one or more interviews conducted by Master Trooper Dominic

4

Caimona and Corporal Randolph Guy. The following testimony was given by Michelle Book on re-cross examination by Attorney Hills:

Q:     Two more questions. I'm sorry to belabor the point. The fact of the matter is there's absolutely no record of this interview between you and the police on seven ten or Toni and the police on seven ten. Now, at least that I know of, I have been provided by the Commonwealth so I'm going to ask you were you notified that you were going to be videotaped or audio recorded when you spoke to Troopers Guy and Caimona on the tenth so you say after the kids were detained by CYS?

A:     Yes, I believe I was audio recorded.

Q:     Were you advised of your rights?

A:     Yes.

Q:     As a criminal defendant on the tenth?

A:     Yes.

MR. HILLS:   Your Honor, I'd like a sidebar, please, if I could?

THE COURT: Sure.

(Sidebar conference)

MR. HILLS:         The reason I asked for sidebar is we just had a witness testify that she was audio recorded and read her right on seven ten, incident to the CYS investigation, Your Honor.

...

MR. HILLS:         The fact of the matter is, Your Honor, I asked and made plenary request for all such interviews and recordings of the same from the Commonwealth, and I received no copies of any interviews on seven ten from either Toni Arnold or Michelle Book.

MS. MCLEAN:      He didn't because I don't have them. Trooper Caimona did not do a very good investigation in New Castle. I don't have them. I don't know that they exist. When I asked, when I talked with Michelle herself, I was under the impression only

5

the July eleven when they took them around that's the only recorded interview I have. I don't have it. I was never given one.

MR. Hills: Honestly, Your Honor, I don't mean [Ms.] McLean is not telling the truth, but the fact of the matter is, Your Honor, I mean, I'm not trying to be a wiseacre here, I think we need a stipulation Officer Caimona didn't do a very good investigation.

MS. MCLEAN: That's not proper at all, Your Honor.

MR. HILLS: We are going to have to have a stipulation he didn't tender certain evidence he had in his possession.

THE COURT: Maybe we need to develop the record as to when the state police interviewed this witness. I don't know. All I have heard is July eleventh so far.

MR. HILLS: She said the tenth, Your Honor.

THE COURT: I understand that's what she said, and your video or audio CD you pulled out yesterday is from seven eleven fifteen.

MR. HILL: Seven thirteen that was Toni Arnold. The only audio recording of [Ms.] Book I have is seven eleven.

THE COURT: Well, I think it's maybe a little premature to say there's a Brady violation here since it's unclear –

MR. HILLS: It's on the record, I'm not accusing [Ms.] McLean of not handing anything over, I just noticed holes like this throughout. Toni alluded to the same that she was interviewed again.

THE COURT: If you want to subpoena Trooper Caimona, I think that's certainly within your right.

MR. HILLS: I think Officer Guy—okay. Can I have [additional] time, I didn't realize that that was going to be needed, Your Honor, to subpoena him, because she had them on her list of witnesses. I know Officer Guy is going to be here. I don't know if Officer Guy was in the alleged interview of seven ten.

6

THE COURT:        Maybe you can ask her that, this witness.

(End of sidebar conference)

BY MR. HILLS:

Q:    When you were interviewed on the tenth, the day the kids were taken by
      CYS, okay?

A:    Yes.

Q:    And you were interviewed by I assume Officer Caimona and Guy, is that
      correct?

A:    No, sir.  It was Trooper Caimona.

Q:    Just Caimona?

A:    Correct.

4/18/2017 N.T., 107-11.

The following exchange took place at sidebar after the Commonwealth rested:

THE COURT:        Any other testimony you're going to get into today from
                  any other witnesses?

MR. HILLS:        I don't believe today, Your Honor, we discussed my having
                  the right to subpoena Trooper Caimona with regard to the
                  alleged testimony that occurred on seven ten.

MS. MCLEAN:       I suggest perhaps – if Randy Guy is here, if he can at least
                  make a phone call to see if, in fact, if it was recorded.  That
                  might –

MR. HILLS:        I'd like to have Trooper Caimona testify as to what's going
                  on.

...

MR. HILLS:        Obviously, we have a discovery issue, and I think it's not
                  attributable to [Ms.] McLean.  I would be remiss and a
                  disservice to my client by not asking all questions –

THE COURT:        I agree with you that needs to be explored.

7

| | |
|---|---|
| MS. MCLEAN: | Can I see if I can make contact? |
| THE COURT: | I'd like to figure out how long it's going to take to finish up the trial. Are you going to call anybody else? |
| MR. HILLS: | I have no objection to Officer Caimona appearing by phone. |
| THE COURT: | Well, I would. |
| MS. MCLEAN: | I have no problem if we take a few minute break and I think Trooper Guy is still here, see if he can contact him, see if he can get him here. |

4/18/2017 N.T., 189-91.

Once Trooper Caimona was contacted, and after he traveled to the New Castle State Police Barracks to retrieve his case materials, he appeared before the Court and testified in part as follows on direct examination by Attorney Hills:

Q: Basically, the reason that you have been called as a witness here today the last minute is during [Ms.] Book's testimony she made reference to the fact or her contention that you interviewed both her and [Ms.] Arnold on the tenth of July, the day before the ride around, ride along interview that you conducted with [Ms.] Book. Is that the case?

A: Yes. I [interviewed] both of them on that day.

Q: Okay. Was also her contention that those interviews, that prior to those interviews you informed her at least that she was audio recorded?

A: [Ms.] Book?

Q: Yes?

A: Okay.

Q: On the tenth? And that you read her her Miranda rights?

A: Correct.

Q: You did?

8

A:	I read her her rights and advised her that I was going to record our interview.

Q:	On the tenth?

A:	Yes.

Q:	Okay. Before the ride along?

A:	Yes, the day before. That would have been a Friday.

Q:	Okay.

A:	I don't know the exact date, but it was Friday. Saturday was the ride along.

Q:	Do you remember correctly that would have been the day that, and I don't know if you would remember the circumstances surrounding it, but that would be the day [Ms.] Book's children were detained by CYS, do you remember that?

A:	Yes, I think that was a Friday. I can give you an exact date if you give me a minute.

Q:	Yes, sir.

A:	Okay, the eleventh was the day I did the ride along with Michelle along with Trooper Guy. So it would have been the tenth.

Q:	So, there was an interview on the tenth, and there was an audio recording made of that?

A:	The audio recording on that date I was going to, I was going to audio record it, but once I started speaking to her I shut the recording off, to gain her confidence and just to speak to her one on one.

Q:	But am I to take it that she was Mirandized?

A:	Yes.

Q:	And that a portion of it at least was audio recorded?

A:	No. After I, after I read her her rights we started speaking, told her that I was going to record our interview, and then decided not to do the audio recording, and we just spoke.

9

Q:     Okay. Correct me if I'm wrong, but I heard your testimony prior to your last statement was that somewhere along the line you decided to stop audio recording?

A:     Yes. I never recorded a statement from Michelle Book.

Q:     Well, you stated you recorded her Mirandization, is that correct?

A:     No, I just read her her rights.

Q:     Did you take any notes as a result of this interview?

A:     I believe I did. I'd have to check my report here. I have several reports so be patient with me. I'm sorry, be patient with me. I have a lot of reports to go through. Just have to find the report that I use as the master number, because if I have, if I'm not mistaken six different burglaries, and I just did one number as a master number and record it under.

Q:     Got you. Take as much time as you need.

A:     I don't have the actual rights warning waiver attached to my report so it's either attached to the recording that's in evidence.

Q:     Excuse me, I'm sorry, I thought you said there was no recording?

A:     There was a recording from the ride along. Can I open this?

MS. MCLEAN:     You're his witness.

MR. HILLS:     I don't know what it is.

MS. MCLEAN:     I don't, either.

MR. HILLS:     What is it?

A:     This is a recording for Toni Arnold's interview.

Q:     On the tenth?

A:     This would be on, no, this was on the twentieth.

Q:     There was an Arnold interview on the twentieth?

A:     Yes. On the tenth both Arnold and Michelle Book were brought in. I interviewed both of them. The eleventh is when we did the ride along. Huh. The eleventh is when I did the ride along with Trooper Guy. After

10

we ascertained more information and for evidence and recovered properties from burglaries from by investigations. We brought [Ms.] Arnold back in and interviewed her again.

Q: On the thirteenth?

A: On the twentieth.

MR. HILLS: Could I have a sidebar, Your Honor?

(Sidebar conference)

MR. HILLS: Your Honor, you can anticipate what I'm going to say. The only two recordings that I was given was ride along interview with Michelle Book on seven eleven and the recorded interview of Toni Arnold on seven thirteen. Now we have references to a Mirandized interview that was initially recorded but then decided not to be recorded on the tenth with both of them, and now there's reference to another recorded interview of Toni Arnold on the twentieth.

THE COURT: I assume we are talking about the twentieth of —

MR. HILLS: July.

THE COURT: That wasn't clearly established.

MR. HILLS: Sorry. But the only interviews that I was given as parts of my discovery package are of seven three interview of Toni Arnold and seven thirteen interview of Toni Arnold and seven eleven ride along interview with Michelle [Book].

THE COURT: So.

MR. HILLS: And if these things contributed to the investigation for these two burglaries my request was a plenary one for all statements, any recordings, any recounting, any notes having to do with statements for witnesses.

THE COURT: Okay.

MR. HILLS: And again I'd like to make it clear I'm not in any way trying to even intimate [Ms. McLean] had, anything, I don't think anybody knew.

THE COURT: And you're asking for what?

MR. HILLS: Well, I mean, you made reference to a Kennedy violation, Your Honor, I believe right? Am I quoting the wrong case?

THE COURT: Aren't you entitled to exculpatory evidence? In the possession of the Commonwealth?

MR. HILLS: I asked for all statements of witnesses and any recordings.

THE COURT: Any guidance for the Court you would want to give me?

MS. MCLEAN: First of all, I don't know that he has testified mistakenly, that he doesn't mean the thirteenth as opposed to the twentieth. I don't know of any interview on the twentieth even with my conversations with [Ms.] Arnold so I don't know that that's an accurate statement for one. Number two, I think perhaps at the very least perhaps counsel should have spoken to the witness and gotten this information before we are in the middle of a jury and I understand it's last minute, but even when he got here, I mean, we don't know what that recording is, we don't know there's anything exculpatory, I don't know anything about it. I still don't know it's from the twentieth and not the thirteenth. I don't know. The first I have heard about it.

MR. HILLS: The very fact [Ms.] McLean doesn't know speaks for itself and I don't believe it my responsibility to contact state's witnesses to see if there's any interviews that the state police officer hasn't disclosed to the Commonwealth as he is asked to do. There's no way for me to question a witness about something I have absolutely no idea let alone something the Commonwealth has absolutely no idea about.

12

MS. MCLEAN: Well, part of it cannot be forgotten that these two cases in Butler are part of a much larger investigation, that involved many other cases in Lawrence County, and that's where a large part of the investigation took place. So, if there are things that the police have in their possession for the Lawrence County investigations that in no way apply to the Butler County case, so there are going to be things that the police have that they would not give me because they don't relate to this case. I just, I don't really intelligently respond to his comment about seven twenty because I don't know that that is true.

THE COURT: Here's what we do know is that there was interviews on seven ten.

MS. MCLEAN: Correct, but we don't know what those interviews were about, either.

MR. HILLS: We note both of them were Mirandized, Your Honor.

MS. MCLEAN: Um hum. This investigation started, Your Honor, with totally unrelated incidents. It wasn't even related to burglaries. That's how the whole investigation started. So I don't know if those interviews on the tenth were about that first incident. That has nothing to do with Butler County. I don't know.

MR. HILLS: I believe [Ms.] Book's testimony was quite clear as to what was discussed on seven ten, Your Honor.

THE COURT: Well, here's what we do know is that Mr. Book was arrested on the thirteenth. So I'm concerned about investigations which occurred prior to the date of this arrest, and we still haven't established whether there are reports of the interviews of seven ten. So, if there are reports, and you were given those reports and allowed to look at them to see whether there is anything in there that is exculpatory or that would lead you to want to have some type of suppression hearing, those are all things it's very difficult to do in mid trial.

13

MR. HILLS:          I agree.

THE COURT:          So, I'm going to pull the plug on the trial.

MR. HILLS:          Thank you, Your Honor.

THE COURT:          Anything else you wanted to put on the record before I do so, [Ms.] McLean? I think let me state my reasons just in case, number one, we have the inadvertent but certainly prejudicial blurt out by [Ms.] Arnold concerning the fact that the [D]efendant was in prison. Then we have Michelle Book's testimony in violation of the spousal privilege and then we have this issue which I think is cumulatively going to make me declare a mistrial at this point.

MS. MCLEAN:         May I respond to just one issue, that would be the marital privilege. I never got to ask about those conversations.

THE COURT:          Well, she testified about them.

MS. MCLEAN:         She testified as to her observations.

THE COURT:          She talked about how he told her that there was a guy in the room when he went in is what I recall her saying.

MS. MCLEAN:         There was no objection to that testimony, Your Honor. The testimony there was no objection to that.

THE COURT:          Well, if there's no objection it's waived. There's no objection. He made it as fast as he could, seems to me.

MS. MCLEAN:         I asked my question was about when I was holding up the Studebaker house, I wasn't even talking about the Roher house when that happened. There was no objection at that time.

MR. HILLS:          I objected about the conversation that occurred.

THE COURT:          In the car.

14

| | |
|---|---|
| MR. HILLS: | The conversation on the way back from there and that's what I objected to. |
| MS. MCLEAN: | Which is way passed (sic) that. |
| MR. HILLS: | She said the guy found them in the house in Roher, that's the room. |
| MS. MCLEAN: | Right. |
| MR. HILLS: | That's when I objected. |
| MS. MCLEAN: | All right. I'm sorry. I'm sorry. |
| THE COURT: | Whatever it is the record will show whether our memories are faulty at this point or not. |

4/18/2017 N.T., 217-28.

The following constitutes the relevant standards by which the Defendant's Motion to Dismiss with Prejudice should be judged:

> The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Pennsylvania Constitution protect a defendant from repeated criminal prosecutions for the same offense. [*Commonwealth v. Kearns,* 70 A.3d 881, 884 (Pa. Super. Ct. 2013), *appeal denied,* 84 A.3d 1063 (Pa. 2014).] Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. *Id.* at 884. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial "not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321, 325 (1992). An error by a prosecutor does not deprive the defendant of a fair trial. *Kearns,* 70 A.3d at 884. "However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied." *Id.* (quoting *Commonwealth v. Chmiel,* 777 A.2d 459, 464 (Pa.Super.2001), *appeal denied,* 567 Pa. 736, 788 A.2d 372 (2001), *cert. denied,* 535 U.S. 1059, 122 S.Ct. 1921, 152 L.Ed.2d 829 (2002)).

> > Thus under Pennsylvania jurisprudence, it is the intentionality behind the Commonwealth's subversion of the court process, not the prejudice caused to the defendant, that is inadequately remedied by appellate review or retrial. By and large, most forms of undue prejudice caused by inadvertent

15

prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial. As this Court has often repeated, '[a] fair trial is not simply a lofty goal, it is a constitutional mandate, ... [and] [w]here that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity.'

*Id.* at 884–85 (quoting *Chmiel,* 777 A.2d at 464).

*Commonwealth v. Graham,* 109 A.3d 733, 736 (Pa. Super. Ct. 2015), *appeal denied,* 126 A.3d 1282 (Pa. 2016).

Underpinning the Defendant's arguments, which were set forth both in his Brief in Support of Defendant's "Motion to Dismiss with Prejudice" and before the Court at the time scheduled for argument, is the notion that the "weakness of the Commonwealth's case was so evident that the pursuant manifest errors therein were likely the result of conscious and concerted effort by Commonwealth Agents, and/or the Prosecutor, aimed at securing a retrial of the Defendant in hopes of retrial being more conducive to an ultimate conviction of him." Additionally, the Defendant asserts that the Commonwealth engaged in conduct that amounted to coaching of at least one of its witnesses, Mustafa Tayfur. No credible evidence was presented to substantiate the Defendant's coaching claim, aside from the testimony set forth in the Defendant's brief. Thus, in the absence of such evidence, we reject the notion as a basis upon which to find prosecutorial misconduct or overreaching that would bar a retrial.

The above exchanges, concerning Toni Arnold and Michelle Book, do not evince prosecutorial misconduct, much less an intention to provoke a mistrial or deprive the Defendant of a fair trial. *See, Graham* 109 A.3d at 737-38. With respect to Toni Arnold, Attorney McLean inquired whether and how frequently her family socialized with the Defendant's family. She did not directly or indirectly inquire whether the Defendant had been in prison. *See Id.* at 737. With

16

respect to the testimony of Michelle Book, Attorney McLean did not ask her to divulge confidential communications. She asked about the Defendant's demeanor and "what happened"? While it is conceivable the inquiries could have been crafted more carefully to avoid Ms. Book revealing the communications of the Defendant, the questioning by no means amounted to prosecutorial misconduct.

We are aware of no authority supporting the notion that the actions of the police, under circumstances as benign as those here, warrant barring a retrial. With respect to those actions, relating to the various July 2016 interviews, we are not persuaded by the Defendant's argument, presented in his brief and at oral argument, that such action should be viewed as having been undertaken in order to provoke a mistrial or to deprive the Defendant of a fair trial. We find there is no evidence to support the notion that Master Trooper Caimona purposefully injected error into the proceedings because he was aware that the Commonwealth's case was not proceeding as planned. It is worth noting that Trooper Caimona was called upon to testify by the Defendant.

Even if the above incidences, relating to the testimony of Ms. Book and Ms. Arnold, as well as the testimony of Trooper Caimona, are viewed *in toto*, and are considered prosecutorial misconduct, we find that there is insufficient evidence to demonstrate that such actions were undertaken with the intention of provoking a mistrial. Likewise, the conduct falls far short of the overreaching that would bar a retrial. In *Smith*, for example, retrial was barred based on the deliberate and prolonged failure to disclose material exculpatory physical evidence during a capital trial. *Commonwealth v. Smith*, 615 A.2d 321 (Pa. 1992). In *Commonwealth v. Martorano*, retrial was barred where the "prosecutor acted in bad faith throughout the trial, consistently making reference to evidence that the trial court had ruled inadmissible, continually

17

defying the trial court's rulings on objections," and repeatedly insisting that there was physical evidence that the prosecutor knew did not exist. *Commonwealth v. Mortorano*, 741 A.2d 1221, 1223 (Pa. 1999). In *Commonwealth v. Anderson*, retrial was barred where a prosecutor engaged in a pattern of pervasive misconduct that culminated in a meeting during which the prosecutor coached the victim-witness, a pattern that demonstrated the prosecutor intentionally acted to prejudice the defendant. *Commonwealth v. Anderson*, 38 A.3d 828 (Pa. Super. Ct. 2011). The conduct of the Commonwealth during the Defendant's second trial does not approach the level required properly to bar a retrial.

Accordingly, the Court enters the following:

# IN THE COURT OF COMMON PLEAS
## BUTLER COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

vs.

SHAWN MICHAEL BOOK

CRIMINAL DIVISION

C.A. No. 1483 of 2015
C.A. No. 0630 of 2016

For the Commonwealth:     Patricia J. McLean, Esq., First Assistant District Attorney
For the Defendant:     Joel L. Hills, Esq.

## ORDER OF COURT

AND NOW, this 19th day of July, 2017, following argument on the Defendant's Motion

to Dismiss with Prejudice, it is ordered that the motion is denied.

By the Court,

William R. Shaffer, Judge

7-20-17.
mcc
Icc
DA(z)
File(1)

AB Hills