J-S29026-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALFONSO SANCHEZ, | : | |
| | : | |
| Appellant | : | No. 3368 EDA 2017 |

Appeal from the Order October 11, 2017
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0001136-2008

BEFORE:   PANELLA, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY MURRAY, J.:                          **FILED JUNE 28, 2018**

Alfonso Sanchez (Appellant) appeals from the trial court's order denying his motion to dismiss on double jeopardy grounds.[1]  After careful review, we affirm.

The trial court summarized the genesis of this case as follows:

---

[1] This interlocutory appeal is properly before us pursuant to Pa.R.Crim.P. 587(B)(6) (If the judge denies the motion but does not find it frivolous, the judge shall advise the defendant on the record that the denial is immediately appealable as a collateral order.); **see also** N.T., 10/11/17, at 228-229 (trial court stating that the motion is not "well-grounded" or "supported by the evidence," but averring that "I can't say, as a matter of fact, that I find it to be frivolous"); Trial Court Opinion, 12/20/17, at 6 ("Because this court found that the Motion to Dismiss on Double Jeopardy grounds was not frivolous on its face, and was not subject to automatic dismissal, [Appellant] was permitted to file an interlocutory appeal of our denial of his Double Jeopardy Motion.").

---

* Former Justice specially assigned to the Superior Court.

On September 30, 2008, after a seven (7) day jury trial, [Appellant] was found guilty of Murder in the First Degree in the shooting deaths of Mendez Thomas and Lisa Diaz. [Appellant] was also found guilty of fifteen (15) other counts including Burglary, Attempted Homicide, Aggravated Assault, Possession of an Instrument of Crime, Criminal Conspiracy (Murder, Burglary, Aggravated Assault, and Possession of an Instrument of Crime), Flight to Avoid Apprehension, and Recklessly Endangering Another Person.

On October 2, 2008, at the conclusion of the penalty hearing for First Degree Murder, the jury sentenced [Appellant] to death for the willful murder of Lisa Diaz and to life imprisonment for the murder of Mendez Thomas.

On October 22, 2008, this [trial c]ourt, in accordance with the verdict of the jury, imposed a sentence of death for the murder of Lisa Diaz, and a consecutive sentence of life imprisonment for the murder of Mendez Thomas.

Trial Court Opinion, 12/20/17, at 1.

A protracted procedural history ensued. *See id.* at 2-5. More than five years later, on December 17, 2013, the Pennsylvania Supreme Court reviewed Appellant's direct appeal *nunc pro tunc* and affirmed his judgment of sentence. *Commonwealth v. Sanchez*, 82 A.3d 943 (Pa. 2013) (rejecting Appellant's argument that because there was insufficient evidence to support his burglary and conspiracy to commit burglary convictions, there was insufficient evidence to prove that that the killings were committed during the perpetration of felonies, and thus the jury considered a non-existing aggravating circumstance when it imposed the death sentence).

On January 30, 2015, Appellant filed a petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. The PCRA court scheduled a hearing for April 19, 2016. The trial court explained:

After the April 19, 2016 hearing, this [c]ourt granted continuances of the PCRA hearing at the request of [Appellant] and his counsel.

Prior to the conclusion of a further PCRA hearing, held on January 26, 2017, the Commonwealth informed this [c]ourt that they were in receipt of a DNA lab analysis report from the Pennsylvania State Police. The DNA report was dated October 2[3], 2008[]. The lab report concerned DNA found under Lisa Diaz's fingernail clippings, which matched the DNA of [Appellant's] co-defendant, Steven Miranda, who in a joint trial with [Appellant], was found guilty by the same jury, of First Degree Murder.

On January 26, 2017, with the agreement of the Commonwealth, this [c]ourt entered an Order vacating the judgment of sentence imposed on October 22, 2008 and ordering a new trial. This Order granting a new trial was the result of a joint motion by the Commonwealth and [Appellant's] PCRA counsel.

On February 14, 2017, this [c]ourt received a *pro se* Motion to Dismiss on Double Jeopardy grounds from [Appellant]. In the Motion, [Appellant] alleged:

"The Commonwealth intentionally suppressed evidence in the form of the DNA report and the evidence itself revealed that Steven Miranda's DNA was under Lisa Diaz's fingernails when she was killed."

"The Prosecutor knew or should have known both pretrial and during the trial that multiple pieces of physical evidence – including the fingernail clippings - had been submitted to the State Police Crime Lab for DNA Analysis."

"The presence of a defendant's DNA under the fingernails of a murder victim is a powerful piece of inculpatory evidence, and here it inculpated Steven

- 3 -

Miranda. Where DNA was found under only one hand, as here, it suggests that Diaz scratched Miranda to defend herself against him as her aggressor."

Upon receipt of this *pro se* Motion to Dismiss for Double Jeopardy, this [c]ourt, on March 31, 2017, forwarded a copy to both the Bucks County District Attorney's Office and the Federal Community Defender Office.

Thereafter, new court-appointed counsel was appointed by this [c]ourt to represent [Appellant] at a re-trial scheduled for October 10, 2017.

Newly court-appointed counsel for [Appellant] requested that this [c]ourt conduct a separate hearing upon the *pro se* Motion to Dismiss on the basis of Double Jeopardy. A hearing was held on October 10 and October 11, 2017, and the motion was denied.

\*\*\*

On October 13, 2017, [Appellant] filed a Notice of Appeal to the Superior Court of Pennsylvania and filed a Concise Statement of Matters on November 3, 2017.

The single issue presented in this appeal is whether this [c]ourt "erred in denying [Appellant's] Motion to Dismiss on Double Jeopardy grounds based on a <u>Brady</u> violation and prosecutorial misconduct."

Trial Court Opinion, 12/20/17, at 5-7.

Likewise, Appellant presents this Court with the same question:

DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION TO DISMISS BASED ON A <u>BRADY</u> VIOLATION AND PROSECUTORIAL MISCONDUCT?

Appellant's Brief at 4.

We review Appellant's claim mindful of the following:

An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a

determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*. To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings:

> Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

*Commonwealth v. Adams*, 177 A.3d 359, 370 (Pa. Super. 2017), citing

*Commonwealth v. Graham*, 109 A.3d 733, 736 (Pa. Super. 2015) (brackets

and citation omitted), *appeal denied*, 126 A.3d 1282 (Pa. 2015). We have

also explained:

> The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of denying him a fair trial. However, because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct.

*Commonwealth v. Wilson*, 147 A.3d 7, 13 (Pa. Super. 2016) (citations

omitted).

Instantly, Appellant argues that the trial court erred in denying his

motion to dismiss, and alleges that suppression of the DNA evidence and the

prosecution's "intentional misrepresentations" and "willful misconduct" bar a

re-trial. Appellant's Brief at 7. Appellant cites *Brady v. Maryland*, 373 U.S.

83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where "the United States Supreme

Court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Commonwealth v. Sullivan*, 820 A.2d 795, 802 n.5 (Pa. Super. 2003). Appellant claims that prior to and during trial, his counsel "repeatedly asked the prosecutor for the status of DNA testing on the victim's fingernails. At first the prosecutor gave no answer, but eventually said he had checked and no such testing had been or was being done [when] in fact the Warminster [Township] police had been notified about pending testing." Appellant's Brief at 7. Appellant concedes that to prevail on his *Brady* claim, he must "show that the prosecutor's misconduct was intended to provoke the defendant into moving for a mistrial, or that the conduct of the prosecutor was intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.* at 8, citing *Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992) (holding that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial).

In support of his allegation of willful misconduct, Appellant references testimony from his trial counsel, Jack McMahon, Esquire, that Mr. McMahon's defense theory was that Appellant's co-defendant had committed the murder,

and that Mr. McMahon would have used the exculpatory DNA evidence at Appellant's trial. Appellant's Brief at 10, citing N.T., 10/11/17, at 132. Appellant further references Mr. McMahon's testimony that he repeatedly asked the district attorney at the time, Thomas Gambardella,[2] about the DNA evidence prior to trial and during jury selection. Appellant's Brief at 10. Mr. McMahon testified that Mr. Gambardella told him that no fingernail testing had occurred and opined that Mr. Gambardella lied to him. *Id.*, citing N.T., 10/11/17, at 141.

Appellant additionally cites the testimony of Detective John Bonargo, who learned in September 2008 – the month of Appellant's trial – that the Pennsylvania State Police (PSP) had completed a preliminary report and would be sending the fingernail clippings for further testing. Appellant's Brief at 9. That report was dated October 23, 2008, and showed an absence of Appellant's DNA on the victim's fingernails. Detective Bonargo testified that he did not speak to Mr. Gambardella about the report, causing the trial court to remark that "[s]omeone wasn't minding the store." *Id.*, citing N.T., 10/11/17, at 226.

In response, the Commonwealth concedes that its "failure to ensure that Appellant was advised prior to trial that [DNA] testing was being undertaken warranted relief by way of a new trial." Commonwealth Brief at 29.

---

[2] Thomas Gambardella is currently a Magisterial District Judge; he worked as a district attorney in Bucks County until 2010. N.T., 10/10/17, at 85.

Conversely, though, the Commonwealth states that "there was no intentional attempt by the prosecution to deprive [Appellant] of a fair trial, [and] Appellant's request to prevent a retrial in this capital murder case on double jeopardy grounds is wholly unjustified." *Id.* Specifically, the Commonwealth argues:

> The record establishes that neither the affiants nor the prosecutor in this case believed that evidence had been submitted to the laboratory for DNA analysis and proceeded to trial on that belief. The fact that this belief proved erroneous was not the result of intentional prosecutorial misconduct, but, rather, failure to communicate among the officers involved in the investigation of the case.

*Id.* at 29. The essence of the Commonwealth's argument is that the credible evidence failed to establish that the erroneous conduct was taken to intentionally subvert the court process and deny Appellant a fair trial. *Id.* at 32. The Commonwealth, referencing hearing testimony, states that the "failure on the part of the officers and the assigned prosecutor to effectively communicate with one another regarding this issue resulted in the collective ignorance of the prosecution team at the time of trial as to the existence of either the testing or the lab report." *Id.* at 34. Significantly, the Commonwealth contends that "[i]n contrast to the compelling and credible evidence that the prosecution did not intentionally conceal or suppress the DNA evidence in this case, the only information provided to the trial court to support Appellant's claim to the contrary was that imparted by Mr. McMahon." *Id.* at 39.

We have reviewed the record and specifically the notes of testimony. The document at issue was formally introduced as the report from the Pennsylvania State Police Bureau of Forensic Services, DNA Laboratory in Greensburg, Pennsylvania, dated October 23, 2008. *See* N.T., 10/10/17, at 79-80. Pertinently, Mr. Gambardella[3] testified that he did not "recall directing" the taking and submission of DNA testing, and it was "something that the detectives could decide to do on their own." *Id.* at 78. Further, it was not until after trial that Bucks County Detective McDonough told him that the detective had received "a report, I believe from Warminster [Township], involving DNA analysis, but that's my recollection. That was after the verdict, well after verdict." *Id.* at 79. Mr. Gambardella testified that he immediately forwarded the report to Appellant's counsel, Mr. McMahon. *Id.* at 80, 82, 84, 93. Mr. Gambardella stated:

> I didn't make a judgment at the time. I think it's for Mr. McMahon to do, to make a judgment as to what value the evidence might have had, if any, but it was an analysis that came in involving the case and involving one of the co-defendants who was present at the scene, even though he had a relationship, or that's my recollection, with the victim, but because it was material to the facts involving a co-defendant, I immediately turned it over. . . . [A]gain, it was something that involved the case. Whether it involved [Appellant] or not, [Appellant] or [his co-defendant], because it involved one of the defendants, I determined, as I would for anything of this nature, that it should be turned over.

---

[3] As previously noted, Thomas Gambardella is now a Magisterial District Judge. However, because Judge Gambardella was a district attorney during the timeframe relevant to our analysis, we refer to him as Mr. Gambardella.

N.T., 10/10/17, at 96.

When asked whether he had intentionally withheld evidence, Mr. Gambardella replied, "[n]o, never." *Id.* at 97. He also testified that he did not know of any detectives or police intentionally withholding evidence. *Id.*

Warminster Township Police Detective John Bonargo testified to working with the Bucks County District Attorney's office and taking the fingernail evidence to the PSP for analysis in November of 2007. N.T., 10/11/17, at 9, 18. At the time, Detective Bonargo listed his name on the submission form as the "point of contact." *Id.* at 10. However, he stated that he "didn't have any personal conversations" with the lead investigator, Detective Harold, about the evidence, and opined that he "should have." *Id.* at 20. It was not until 2008 when PSP contacted Detective Bonargo about the fingernail clippings. *Id.* The detective testified that he received the DNA analysis "post conviction." *Id.* at 22. He did not recall being asked by anyone prior to trial about the DNA testing occurring. *Id.* at 23. He explained that when he went to the lab and retrieved the report he:

> [r]eturned to headquarters, put those items in evidence, and placed the serology report on my Sergeant's desk, which in hindsight, I should have notified the affiant [Detective Harold] in the case right away so they would know immediately those items were back.

N.T., 10/10/17, at 12.

Appellant's trial counsel, Mr. McMahon, testified on Appellant's behalf. He stated:

- 10 -

I think I asked [the assistant district attorney, Mr. Gambardella,] prior to trial. I asked him twice during the trial, or during the jury selection process, because just after all my experience trying homicide cases, there is no way that the Pennsylvania State Police clipped those [finger]nails and then did nothing with them.

N.T., 10/11/17, at 131-132.

He continued:

[T]he first time I asked him was on the telephone. He said he didn't know. He did not – he just wasn't sure, and I said check into it. Then he told me that they were – that no testing was done. Then when we came back here again I said, look, you got to go check again, and he told me that he called the Pennsylvania State Police, because I said to him, Gary, come on, man, there's no way, and he said he called the Pennsylvania State Police and they said they did not analyze those forensically in any way, shape, or form, and I said that's nonsense. I said to him you've got to talk to somebody else because that's just, I don't know who you spoke to, but whoever you spoke to is not giving you the right information. He talked to me the next day and said he spoke – I said you got to speak to a supervisor or somebody, and he came back and said, Jack, they did not test those items, I double checked.

*Id.* at 132-133. Mr. McMahon stated that he had a "hundred percent clear recollection" that was "crystal clear." *Id.* at 133. He averred that the fingernail evidence was "very, very significant" and "key to the defense" because his theory was that Appellant's co-defendant, Steven Miranda – not Appellant – was the shooter and would have left DNA evidence under the victim's fingernails. *Id.* at 137-138. He explained:

[The evidence] would have demonstrated and assisted me in that theory that I tried to, if you read the trial [transcript] you'll see that I tried to present a pretty, vociferously, [sic] that [Steven] Miranda was the actor, the major player. He was the one that was doing all the things. This [DNA] report here would have been extremely helpful and back that up. I should have had it.

- 11 -

*Id.* at 142.

However, on rebuttal, Mr. Gambardella testified to the contrary.  He stated:

> There were very few conversations either in person or over the phone with Mr. McMahon, because largely, because he was so hard to get a hold of.  I had no conversation with him at the preliminary hearing because he failed to appear for the preliminary hearing.  I had very, what I will call, I would have difficulties getting a hold of him.  There was, at one point, I know of at least one letter that I sent him.  I reduced a lot of my correspondence to writing to make sure that the messages were getting across.

N.T., 10/11/17, at 150-151.

With regard to the fingernail clippings, Mr. Gambardella stated that he "did not have a recollection of [Mr. McMahon] ever mentioning fingernail clippings, ever." *Id.* at 159.  Further, Mr. Gambardella opined that if he had such evidence, he would have viewed it as favorable to the Commonwealth because it corroborated the witnesses who testified that Appellant's co-defendant, Steven Miranda, and the victim, Lisa Diaz "had a relationship." *Id.* at 159.  In sum, Mr. Gambardella testified, "I never contacted the police regarding DNA analysis because I didn't know there was DNA analysis." *Id.* at 164.

Warminster Police Detective Sean Harold offered testimony similar to that of Mr. Gambardella.  Detective Harold stated that in October of 2007, he was the "lead investigator" in the case against Appellant. *Id.* at 174.  Detective Harold testified that he was unaware of any evidence taken by

Detective Bonargo to the PSP lab for testing. *Id.* at 175. He specifically did not recall fingernail clippings being recovered from Lisa Diaz. *Id.* at 176. Detective Harold repeatedly testified to his belief that "back in 2008 that no evidence in this case had been sent for DNA testing." *Id.* at 178. He did not learn about the evidence that had been submitted to the lab until April of 2016, and opined that he "absolutely [did] not" intentionally withhold evidence in this case. *Id.* at 178-179. Detective Harold did not know who "took the initiative" and was responsible for sending the fingernail clippings to the PSP lab, and in fact was not aware that the clippings had even been taken. *Id.* at 180-182.

Similarly, Bucks County Detective Martin McDonough testified to investigating the case in conjunction with the Warminster Township Police, and having no knowledge of fingernail clippings taken from Lisa Diaz and sent to the PSP for DNA analysis. *Id.* at 185-186. He did not learn about the evidence until after Appellant's trial in October of 2008. *Id.* at 186. Detective McDonough learned about the evidence from Detective Bonargo. He stated:

> I believe Detective Bonargo faxed [the DNA report] to me. We had a phone conversation. He said, he had – we had a conversation, I believe it was over the phone, that he had this report from PSP, a DNA report from PSP. And I said, well, send it to me so I can give it to [Mr. Gambardella]. The trial is over, so we can forward it to Mr. McMahon. When I got my copy I made a copy, handed it to Mr. Gambardella in the District Attorney's Office, and I put a copy I had in my file.

*Id.* at 192. Detective McDonough expressed his surprise at learning about the evidence. He continued:

- 13 -

> I said to John [Bonargo], how did it get there? He said he dropped them off and they were being worked on. I said, John, we didn't even know they were at the lab. How did this happen? He really didn't have an answer.

***Id.*** at 193.

After hearing argument from the parties, the trial court denied Appellant's motion to dismiss. The trial court verbally detailed the parties' respective arguments, recounted the testimony, and articulated its rationale for denying Appellant's motion. ***See***, N.T., 10/11/17, at 219-228. On this record, and mindful of applicable legal authority, we discern no error by the trial court in denying Appellant's motion to dismiss. When considering a ***Brady*** violation in the context of double jeopardy, retrial is prohibited "when the conduct of the prosecutor is **intentionally** undertaken to prejudice the defendant to the point of the denial of a fair trial." ***Smith***, 615 A.2d at 325 (emphasis added). In this case, the trial court expressly determined that "the Commonwealth did not engage in conduct which was intended to prejudice [Appellant] and deny him a fair trial." Trial Court Opinion, 12/20/17, at 8. Similarly, in ***Adams***, ***supra***, this Court recently determined that a ***Brady*** violation did not warrant dismissal on double jeopardy grounds. We cited our Supreme Court's decision in ***Commonwealth v. Burke***, 781 A.2d 1136 (Pa. 2001), and explained:

> Here, the alleged prosecutorial misconduct consisted of a ***Brady*** violation that was caused by failures on the part of both the police and the prosecutor. We have no question that if a ***Brady*** violation is committed by a prosecutor, it can result in a dismissal on double jeopardy grounds if it is shown that the

- 14 -

prosecutor intended to deprive the defendant of a fair trial. Although we have found no instance in which we have held that intentional misconduct by the police also should warrant dismissal of the charges under a double jeopardy analysis, we see no reason to foreclose that possibility. Prosecutors must perform their duties under **Brady** in conjunction with the police, and a **Brady** violation may occur where evidence in the possession of the police is not disclosed to the defendant, even if the prosecutor did not know about it. . . .

Even recognizing the important role of the police in disclosing **Brady** material, however, there may be no double-jeopardy dismissal if their misconduct is unintentional or if it does not lead to intentional misconduct of the prosecutor. A leading case is **Burke**. During the course of trial, the prosecutor discovered evidence in a police file, including a statement made by the defendant, and an exculpatory statement made by the Commonwealth's chief witness. The trial court granted the defendant's motion to dismiss based on the discovery violation, noting that the prosecutor was "grossly negligent" in not uncovering the statements earlier, and that the error which had led to their suppression was within the Commonwealth's control. We reversed, and the Supreme Court affirmed our decision. The Supreme Court determined that dismissal was inappropriate because there was no evidence of deliberate, bad faith overreaching by the prosecutor. And the Court described the police misconduct in terms equivalent to negligence:

> Rather than prosecutorial misconduct, it appears that this case primarily involves miscommunication between the police departments involved in the investigation and/or police mishandling of the evidence. . . . Whatever may have been the reason for the nondisclosure here, it is apparent from the record that it did not result from deliberate misconduct by the prosecutor designed to compel [the defendant] into moving for a mistrial or to deprive [him] of a fair trial.

**Burke**, 781 A.2d at 1145–46. There was no allegation in **Burke** that the police intentionally suppressed evidence. **See also Commonwealth v. Wood**, 803 A.2d 217, 222 (Pa. Super. 2002) (remanding for evidentiary hearing on whether prosecutor acted intentionally when failing to provide exculpatory evidence in the possession of the police, without addressing whether police intentionally withheld the exculpatory material).

- 15 -

*Commonwealth v. Adams*, 177 A.3d 359, 372–374 (Pa. Super. 2017) (some citations and footnotes omitted).

Likewise, in this case, we must defer to the trial court's credibility determinations, particularly its finding that the prosecutor, Mr. Gambardella, and the investigating officers, did not intend to deprive Appellant of a fair trial. *See Adams*, 177 A.3d at 370 ("[t]o the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard . . . [and w]here issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. **The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record**.") (emphasis added). The trial court acknowledged the unequivocal testimony of Appellant's trial counsel, Mr. McMahon, which contrasted with the testimony from the Commonwealth's witnesses and particularly Mr. Gambardella. The trial court stated:

> [Mr.] Gambardella denies having those conversations [with Mr. McMahon], but it's not so much an issue of credibility of Jack McMahon and Gary Gambardella. This happened nine years ago. You know, sometimes memories fade and recollections dim, but what is unmistakably clear is that at some point, the Commonwealth had an obligation once they learned of this to turn it over to the appropriate people.

N.T., 10/11/17, at 224. The trial court continued:

- 16 -

So as we learned, nobody seems to know how this evidence from Lisa Diaz got to the Pennsylvania State Police. Obviously, it didn't get there by itself. So it's clear to me, just directly and inferentially, that it was Detective John Bonargo who submitted this. Now, did he do this ultra vires? Did he do this without any approval? No, he probably assumed it was taken from one of the victims and it should be analyzed. I can't speculate or guess why it took the Pennsylvania State Police that long to analyze it. It's just unfortunate that the report comes in after the verdict.

So having said all of that, the defense would have me believe that there was a conscious decision, a willful co[ll]usion to withhold evidence which was perhaps exculpatory to [Appellant], and therefore, consistent with my duties under the Constitution, I am to find that he would be, on a retrial, placed in jeopardy twice of life and limb. I cannot find that because there is no evidence to indicate that.

My conclusion, based on the evidence I heard, common sense, the testimony, having presided over the trial, is simply this. Someone wasn't minding the store, necessarily. Detective Bonargo submitted evidence that perhaps he did on his own initiative, but no one, by any stretch, intentionally withheld that evidence which would arise to prosecutorial misconduct.

N.T., 10/11/17, at 226-227.

As indicated above, the trial court determined that "someone wasn't minding the store," *i.e.*, that there was miscommunication between the police, the prosecutor and the defense. This Court in **Adams** stated that "miscommunication between the police and the prosecutor, alone, cannot be the basis for misconduct." 177 A.3d at 374, citing **Burke**, 781 A.2d at 1145–46. We therefore are unpersuaded by Appellant's claim of intentional prosecutorial misconduct. In sum, the trial court found that there was no intent to deprive Appellant of a fair trial, and because that finding is supported

by the record and our *de novo* review, we affirm the trial court's denial of Appellant's motion to dismiss on double jeopardy grounds.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/18